John M. MORRIS, Appellant,

v.

UNITED STATES, Appellee.

No. 12259.

District of Columbia Court of Appeals.

Argued Feb. 15, 1978.

Decided July 21, 1978.

As Amended Nov. 28, 1978.

Robert P. Mosteller, Public Defender Service, Washington, D. C., for appellant.

Jeffrey Blumenfeld, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Michael W. Farrell, and Alexia Morrison, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before NEWMAN, Chief Judge, and MACK and FERREN, Associate Judges.

NEWMAN, Chief Judge.

Convicted by a jury of armed robbery and possession of a prohibited weapon (sawed-off shotgun), appellant challenges the admission of testimony concerning the description of the robbers given by the complainant to police officers immediately after the robbery. Appellant also argues that the trial court abused its discretion in refusing to permit cross-examination of appellant's girlfriend as to his actual use of her father's car on the day of the incident. We affirm.[1]

In the early afternoon of August 4, 1976, Daryl Covington was robbed by two men, one of whom was armed with a sawed-off shotgun. During the course of the robbery, Covington, along with Kenneth E. Bryant, had the opportunity to observe both robbers. During the robbery, one of the robbers fired the shotgun at Covington. As the robbers fled, Covington noted that their getaway car was a beige 1975 or 1976 Chevrolet Nova or Pontiac Ventura (both of

---

1. Appellant also claims reversible error with respect to his impeachment by prior convictions, i. e., that the trial court erred in refusing to permit him either to bring out his prior convictions during direct examination or to explain the circumstances and consequences of the prior convictions. Our decision in *Kitt v. United States*, D.C.App., 379 A.2d 973 (1977), makes clear that the trial court in fact did err in prohibiting appellant from bringing out his convictions on direct examination. However, we deem such error harmless since we are able to say "with fair assurance . . . that the judgment was not substantially swayed by the error." *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946).

which were of a similar body design) with District of Columbia license plates, the first three numbers of which were either 2–7–0 or 2–0–7. Covington pursued the robbers. After failing to catch them, he flagged down Metropolitan Police Department (MPD) Officer Lester Howard who was in a police car cruising on Alabama Avenue, S.E. He gave Officer Howard a description of both the getaway car and the robbers.

Working from Covington's description of the car, MPD Detective James Colbert obtained a computer printout listing eleven 1975 and 1976 Novas carrying the appropriate first three license plate numbers. Of those eleven, only one was beige, the color of the getaway car as described by Covington. That car was registered to Edward Brantley, but was used by Brantley's daughter, Gwenievere Etienne. Subsequent investigation disclosed that Etienne's boyfriend, appellant John M. Morris, matched the description supplied by Covington of one of the robbers. Covington later selected appellant from a photo array, identified him in a lineup, and identified him in court as one of the persons who robbed him at gunpoint.

At trial, and over the objection of defense counsel, Covington repeated the description of the robbers which he had provided to the police immediately following the robbery:

> [T]all, slender build, thin features, and wore glasses . . . . Approximately six-one, maybe six-two . . . . Light, brown skin . . . . [H]is face features were real thin, reminded me of someone who had been sick maybe . . because . . . his face features were sort of sunken somewhat. . . . [H]is glasses were thick, . . . tinted lenses; frames I think were brown.

During cross-examination, Covington was questioned extensively concerning his description of the assailants. Defense counsel explored alleged inconsistencies between his description testimony given to the grand jury and the description he had testified to during direct examination.

Over objection, Covington's description of the robbers was also recounted to the jury by Officer Howard. To refresh his recollection of Covington's description, Officer Howard perused a transcript of the description which he had transmitted for broadcast over police radios immediately after the incident, as well as the MPD Form 251 which he had used to record Covington's report of the incident. On cross-examination, defense counsel thoroughly probed for inconsistencies between Covington's initial description, as recounted by Howard, and his later descriptions. '

Covington's description was repeated, again over objection, by Detective John Love. Following Love's testimony, the trial court *sua sponte* gave a cautionary instruction:

> There have been recitations here, if you believe them, about certain statements made by the complaining witness in this case to the officer. The fact that they are given to the officer obviously don't make them true or untrue in the case. You've got to determine on their truth from the time that you heard the witness' testimony from the stand itself. These statements are admitted here only as they may or in your judgment may not affect the credibility of the original witness to the case. Because the testimony of a witness may be rehabilitated or supporting that he previously made statements which are consistent with his present testimony in court and this is the only reason for which these are admitted, not for the truth of the statements themselves.

The government's final witness was Gwenievere Etienne. On direct examination, she testified that her father was Mr. Edward Brantley, that during August 1976 she used a beige 1975 Nova, and that she was appellant John Morris' girlfriend. Defense counsel sought to cross-examine Etienne as to whether Morris did in fact have access to, or the use of, her automobile on August 4, 1976, the day of the robbery. The trial court refused to permit this line of cross-examination, concluding that the requested line of cross-examination exceeded the scope of direct examination: "[T]his

isn't a broad or British cross-examination jurisdiction. We still do abide by the rule that the scope of the direct is the measure of the cross."

Appellant called Etienne as a defense witness. She testified that during August 1976, she and appellant lived together. She stated that she then owned a beige 1975 Nova, but that Morris was not permitted to use the car.

Etienne also provided testimony which was consistent with appellant's alibi defense. She stated that on the day of the robbery, she drove her car to work, returned home at about 11:30 a. m., picked up Morris, drove with him to perform various errands, and dropped him off at the apartment at about 12:45 p. m. whereupon she immediately returned in her car to work. On cross-examination, Etienne was impeached with three prior inconsistent statements she had made to the grand jury: (1) before the grand jury, she stated that she remembered August 4 because it was a payday, but at trial she testified that she received no paycheck that day; (2) in her trial testimony, she identified a different bank as the bank to which she went with Morris on the day of the robbery; (3) before the grand jury she stated that her brothers had used her car and gone somewhere with Morris on perhaps one occasion only, but at trial she testified that this had never occurred.

At the conclusion of the defense evidence, the case was submitted to the jury which returned a verdict of guilty. This appeal followed.

The first issue presented by appellant in this court concerns the admission of Covington's description of his assailant which he provided to the police immediately following the robbery. Appellant argues that the testimony of Covington, Officer Howard, and Detective Love recounting Covington's description was inadmissible as both hearsay and a prior consistent statement and that he was prejudiced by its admission. The government contends that the rationale of the line of cases validating the admission of out-of-court identifications, *e. g., Clem-*

*ons v. United States,* 133 U.S.App.D.C. 27, 408 F.2d 1230 (1968) (en banc), *cert. denied,* 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969), likewise supports admissibility of the out-of-court description of the culprit given by the victim of a crime to police authorities.

"Hearsay evidence is testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of the matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter." C. McCormick on Evidence § 246 at 584 (2d ed. 1972). Pursuant to Anglo-American legal tradition, hearsay evidence was historically excluded at trial because it failed to satisfy one or more of the three primary prerequisites to the admissibility of testimony: oath, the personal presence of the declarant at trial, and the availability of the declarant for cross-examination so as to test both his credibility and the accuracy of his statement. C. McCormick, *supra* § 245 n.25, citing Strahorn, *A Reconsideration of the Hearsay Rule and Admissions,* 85 U.Pa.L.Rev. 484 (1937). Today, this third factor—"the lack of opportunity for the adversary to cross-examine the absent declarant whose out-of-court statement is reported by the witness"—is considered the major justification for the exclusion of hearsay evidence. *Id. See also* Fed.R.Evid. 801, Advisory Committee Notes.

As with any rule, that concerning hearsay is replete with exceptions. Thus, where the circumstances surrounding the out-of-court statement satisfy a requisite level of reliability and trustworthiness, the testimony is admitted despite the fact that it otherwise falls within the definition of excludable hearsay.

One such exception permits the admission of extrajudicial identification made prior to trial through testimony at trial of either the identifier or third parties present at the prior identification. Such identification testimony is admitted for the purpose of corroborating the witness' in-court iden-

tification.[2] Thus, in *Mack v. United States*, D.C.Mun.App., 150 A.2d 477 (1959), the court permitted, for the purpose of corroboration, testimony by the victim of a robbery as to his identification of the accused made at the police station, in the presence of the accused, shortly after the incident. The court noted with approval Wigmore's rationale for the admission of extrajudicial prior identification testimony as corroboration: "To corroborate the witness, therefore, it is entirely proper . . . to prove that *at a former time*, when the suggestions of others could not have intervened to create a fancied recognition in the witness' mind he recognized and declared the present accused to be the person." *Id.* at 479, quoting 4 J. Wigmore on Evidence § 1130 (3d ed. 1940) (emphasis in original).

While courts in some jurisdictions continued to admit prior identification testimony solely to corroborate an in-court identification, a trend developed to admit such evidence as well for the purpose of independent evidence of identity as long as the identifier was available for cross-examination at trial. *See* Annot., 71 A.L.R.2d 449 (1960). The Supreme Court in *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), took note of the trend and explained the rationale:

> It has been held that the prior identification is hearsay, and, when admitted through the testimony of the identifier, is merely a prior consistent statement. The recent trend, however, is to admit the prior identification under the exception that admits as substantive evidence a prior communication by a witness who is available for cross-examination at trial. *See* 5 A.L.R.2d Later Case Service 1225–1228. That is the California rule. In *People v. Gould*, 54 Cal.2d 621, 626, 7 Cal.Rptr. 273, 275, 354 P.2d 865, 867, the Court said:
>
> > Evidence of an extrajudicial identification is admissible, not only to corroborate an identification made at the trial

. . ., but as independent evidence of identity. Unlike other testimony that cannot be corroborated by proof of prior consistent statements unless it is first impeached . . . evidence of an extrajudicial identification is admitted regardless of whether the testimonial identification is impeached, because the earlier identification has greater probative value than an identification made in the courtroom after the suggestions of others and the circumstances of the trial may have intervened to create a fancied recognition in the witness' mind. . . . The failure of the witness to repeat the extrajudicial identification in court does not destroy its probative value, for such failure may be explained by loss of memory or other circumstances. The extrajudicial identification tends to connect the defendant with the crime, and the principal danger of admitting hearsay evidence is not present since the witness is available at the trial for cross-examination. [388 U.S. at 272–73 n.3, 87 S.Ct. at 1956. (citations omitted).]

This jurisdiction clearly adopted the prior identification exception to the hearsay rule in *Clemons v. United States, supra*. There, the defendant urged the court to categorize as hearsay and therefore hold erroneous the admission of a pretrial identification by a witness whose in-court identification was unimpeached. Instead, the court validated the admission of the prior identification testimony, ruling that the availability of the declarant for cross-examination at trial vitiated the necessity for excluding the pretrial identification testimony on the basis of hearsay:

> We think the rationale behind the exclusion of hearsay evidence has little force in the case of witnesses, such as those here involved, who are available for cross-examination. We also think that juries in criminal cases, before being called upon to decide the awesome question of guilt

---

2. Such testimony is, of course, always permissible to rehabilitate a witness whose testimony has been impeached. *See, e. g., United States*

*v. Alexander*, 139 U.S.App.D.C. 163, 430 F.2d 904 (1970).

or innocence, are entitled to know more of the circumstances which culminate in a courtroom identification—an event which standing alone, often means very little to a conscientious and intelligent juror, who routinely expects the witnesses to identify the defendant in court and who may not attach great weight to such an identification in the absence of corroboration. [133 U.S.App.D.C. at 40, 408 F.2d at 1243.]

See also United States v. Miller, 381 F.2d 529 (2d Cir. 1967); Edison v. United States, 272 F.2d 684 (10th Cir. 1959); United States v. Forzano, 190 F.2d 687 (2d Cir. 1951); Bolling v. United States, 18 F.2d 863 (4th Cir. 1927); United States ex rel. Bryant v. Vincent, 373 F.Supp. 1180 (S.D.N.Y.1974).

██ We believe that the rationale for the admission of prior identification testimony applies with full force to the admission of prior *description* testimony herein challenged. The prior description given by Covington, testified to by Covington himself, Officer Howard, and Detective Love, served to corroborate the in-court identification of the appellant and was subjected to thorough cross-examination at trial for errors and inconsistencies. Moreover, the circumstances surrounding ·Covington's recounting of the pretrial description, which had been rendered in the midst of a chase by the victim of the robbery, with little time for reflection or opportunity to fabricate, provided sufficient indicia of trustworthiness and reliability to warrant admission. Cf. Nicholson v. United States, D.C.App., 368 A.2d 561, 564 (1977) (quoting United States v. Glenn, 154 U.S.App.D.C. 61, 64, 473 F.2d 191, 194 (1972) (circumstances surrounding spontaneous utterance by victim of violent crime justifies conclusion that remarks not made under "impetus of reflection")). We note, too, that the contemporaneous recordation of Covington's pretrial description by Officer Howard on MPD Form 251 and in the radio broadcast transcript provided additional indicia of reliabil-

ity to the description testimony.[3] Thus, we hold that where a witness who has provided pretrial description evidence is available for cross-examination, such pretrial description may be admitted as independent, substantive evidence.

As his second claim of error, appellant argues that the trial court unduly restricted the scope of cross-examination of Etienne. He claims that the inference from Etienne's direct testimony was that Morris used Etienne's car and argues that he should have been permitted to refute that inference immediately through cross-examination. He contends that prejudice resulted from the trial court's limitation on cross-examination since he was then forced to call Etienne as a defense witness, thus permitting the government to impeach her testimony, which supported appellant's alibi defense, by prior inconsistent statements which she had made to the grand jury. The government counters by arguing that the scope of the direct testimony did not include any inferences of Morris' use of the car, but merely the *fact* that Etienne was Morris' girlfriend and the *fact* that she had the use of a beige 1975 Nova in August 1976. The government further claims that the requested line of cross-examination was impermissible since it would have enabled appellant to place before the jury a key element in his defense prior to the presentation of his case.

██ It is axiomatic that as long as the Sixth Amendment guarantee of the right to confrontation is satisfied, the extent and scope of cross-examination of a witness with respect to an appropriate subject of inquiry is committed to the sound discretion of the trial court. Alford v. United States, 282 U.S. 687, 694, 51 S.Ct. 218, 75 L.Ed. 624 (1931); Springer v. United States, D.C. App., 388 A.2d 846 (1978).

As the court observed in United States v. Bender, 218 F.2d 869 (7th Cir.), cert. denied, 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1253 (1955):

---

**3.** The record in this case negates any contention that the descriptions were in any manner the product of suggestivity, undue or other-

wise. See Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

It is the trial judge's duty to so control the presentation of evidence to the jury that it will be as well organized and understandable as possible. The traditional procedure is for the defendant to present his defense. As each witness testifies, it is important that the opposing party have an opportunity to test his truthfulness and competency. But it is also important that the regular procedure of the trial be maintained.

.　　.　　.　　.　　.

[Therefore,] [t]he trial judge's duty to see that the evidence is presented to the jury in as orderly and understandable a manner as possible requires that he have broad discretion in such matters. [218 F.2d at 873–74].

See *Baker v. United States*, 131 U.S.App. D.C. 7, 36, 401 F.2d 958, 987 (1968), cert. denied, 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970).

■ In exercising its discretion, the trial court should permit exploration of any matters which tend to contradict, modify, or explain the testimony given by a witness during direct examination.[4] *Smith v. United States*, D.C.App., 330 A.2d 519, 520 (1974); *Waller v. United States*, D.C.App., 389 A.2d 801 (1978).

■ In the instant case, the government's questions to Etienne on direct examination were directed to elicit two specific facts, *i. e.*, that she did have use of a car which matched the complainant's description of the getaway vehicle and that appellant was her boyfriend. It is clear from the record that these facts were established in order for the jury to infer that Morris had access to the car. Thus, the requested cross-examination, which sought to "explain" both the facts and inferences elicited from Etienne on direct examination, was appropriate. See *Smith v. United States*, supra.

■ Although we find that the trial court erred in failing to permit the request-

ed cross-examination, we take the additional step to determine whether that error is harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), *Springer v. United States*, D.C.App., 388 A.2d 846, 856 (1978). In *Springer* we stated:

To hold harmless such error in curtailing constitutionally-protected cross-examination, it must be clear beyond a reasonable doubt "(1) that the defendant would have been convicted without the witness' testimony, or (2) that the restricted line of inquiry would not have weakened the impact of the witness' testimony." Note, *Constitutional Restraints on the Exclusion of Evidence in the Defendant's Favor: The Implications of Davis v. Alaska*, 73 Mich.L.Rev. 1465, 1473 (1975) (footnote omitted). [*Springer v. United States, supra*, at 856.]

In this regard we note that the information which defense counsel hoped to elicit by cross-examination—that Morris had no access to Etienne's car—was brought out through direct examination of Etienne when called as a defense witness. We note further that the alibi testimony offered during that examination was wrapped up with her own use of the car and that the statements upon which she was impeached touched upon the alibi, not upon appellant's access to the car. More specifically, we note that the three points upon which Etienne's alibi testimony was impeached by prior inconsistencies did not touch or concern her claim that appellant was not permitted to use the car; thus, appellant's decision to present the alibi, rather than the court's ruling, led to the impeachment. We are unable to agree, therefore, that delaying appellant's ability to contradict the inference that the car was generally available to him impaired his case. We conclude that the restricted line of inquiry would not have weakened the impact of the witness' testimony and that the error was harmless beyond a reasonable doubt. *Chapman v. California, supra*, 386 U.S. at 24, 87 S.Ct. 705.

*Affirmed.*

---

4. This jurisdiction follows the "federal" rule that the scope of direct examination delimits the reach of cross-examination, rather than the "broad" or "British" rule which permits wide-ranging cross-examination. See 6 J. Wigmore, *supra* § 1885.