David L. BROOKS, Appellant,

v.

UNITED STATES, Appellee.

Nos. 84–1310, 86–284.

District of Columbia Court of Appeals.

Argued Oct. 19, 1987.

Decided Jan. 29, 1988.

**1092**

W. Gary Kohlman, Washington, D.C., for appellant.

David H. Saffern, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell and Kathleen E. Voelker, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before FERREN and ROGERS, Associate Judges, and REILLY, Senior Judge.

ROGERS, Associate Judge:

In these consolidated appeals, appellant David L. Brooks appeals from his conviction by a jury of first-degree premeditated murder while armed, D.C. CODE §§ 22–2401, –3202 (1981), and the denial of his motion for a new trial, SUPER.CT.CRIM.R. 33. He contends that the trial judge erred (1) in curtailing cross-examination of a government witness with respect to a prior statement of the only eyewitness and in subsequently restricting the defense's ability to call that person as a witness, contrary to the rule of completeness, and (2) in not adequately correcting prosecutorial misconduct in the closing argument. He further contends that the trial judge erred in denying his motion for a mistrial, in which he argued that a new trial was necessary because of newly discovered evidence, jury contamination, and the failure of the government to disclose, pursuant to request and obligation, the complete criminal record of one of its witnesses. We affirm.

## I

The government's evidence showed that on September 9, 1980, Brooks and three companions, Gilliam, Edmunson and Mackenheimer engaged in an early morning indulgence in drugs and sex. At some point, Brooks claimed that one of them had stolen his money. He soon focused his accusation on Mackenheimer, the eventual victim, and ordered Gilliam and Edmunson to strangle her, first with a cord and then with a wire hanger. Brooks also beat Mackenheimer with his fist and a hammer. Later that day, Gilliam told her friend Catlett what had happened.[1] Of Brooks' claims of error during his trial, only one warrants discussion.[2]

Brooks challenges the trial judge's restrictions on his examination of Catlett regarding Gilliam's statements. Catlett testified that Gilliam told her she had seen a girl get killed and that Itchy (Brooks' nickname) had done it; Catlett identified Brooks as the man Gilliam had identified to her some months later. The government did not inquire further into the details of Gilliam's statement to Catlett. On cross-examination, Brooks sought to have Catlett testify as to Gilliam's entire statement in order to demonstrate that Catlett's grand jury testimony about Gilliam's statement was inconsistent in certain respects with Gilliam's version at trial. The judge sustained the government's objection on the ground that these details were beyond the scope of the government's examination. Brooks also contends that the trial judge erred when he subsequently refused to allow Brooks to call Catlett without first calling Gilliam to testify about her entire statement. He argues that both rulings

---

1. Other than placing several exhibits into evidence, Brooks did not put on a defense.

2. Brooks' contention that, in closing argument, the prosecutor misstated the evidence with respect to the hair found clutched in Mackenheimer's hand, is meritless. The statement was accurate and did no more than ask the jury to draw a permissible inference. *See Hammill v. United States,* 498 A.2d 551, 554–58 (D.C.1985); *Sherrod v. United States,* 478 A.2d 644, 655–59 (D.C.1984); *Tuckson v. United States,* 364 A.2d 138, 141–42 (D.C.1976). But, assuming error, Brooks is unable to demonstrate prejudice since the evidence was at best of minimal relevance because it did not directly concern Brooks, *see Hammill, supra,* 498 A.2d at 554 (whether di-

rectly related to guilt or innocence), and defense counsel did not object to the trial judge's general instruction that arguments by counsel are not evidence, or move for a mistrial. *Hairston v. United States,* 497 A.2d 1097, 1103 (D.C. 1985) (jury is presumed to follow instructions). In her closing argument, defense counsel had dissipated any inadvertent prejudice by specifically calling the jury's attention to the fact that Gilliam had testified that Edmunson's hair was brown; the prosecutor did not respond in rebuttal. *See Hawthorne v. United States,* 504 A.2d 580, 594 (D.C.) (prejudice dissipated), *cert. denied,* —— U.S. ——, 107 S.Ct. 593, 93 L.Ed.2d 594 (1986).

were wrong because, under the rule of completeness, a party who is prejudiced by the admission of one part of a conversation may require the contemporaneous admission of other relevant parts of that conversation. *See, e.g., United States v. Walker,* 652 F.2d 708, 710–13 (7th Cir.1981); *United States v. Littwin,* 338 F.2d 141, 145–46 (6th Cir.1964), *cert. denied,* 380 U.S. 911, 85 S.Ct. 896, 13 L.Ed.2d 797 (1965).

Both of the trial judge's rulings were correct. As to the first, the government sought Catlett's testimony about Gilliam's prior consistent statement identifying Brooks in order to rebut defense allegations that Gilliam's story was a recent fabrication.[3] Gilliam had been asked on cross-examination whether she knew that the police wanted to "get" Brooks and that they had Brooks' fingerprint; she also admitted becoming pregnant sometime after her first sexual encounter with Brooks, but denied that Brooks was the father. She denied trying to get money from Brooks by accusing him of being the father. By these questions, Brooks clearly suggested that Gilliam had invented her story either to exonerate herself and Edmunson and to satisfy the police, or to repay Brooks for impregnating her and not taking responsibility.

■ A trial judge is vested with wide discretion in controlling the cross-examination of witnesses, *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986), and does not abuse that discretion by limiting cross-examination to those matters that are raised by the direct examination. *Holt v. United States,* 381 A.2d 1388, 1390 (D.C.1978). Under the recent fabrication exception to the hearsay rule, the only relevance of the earlier statement concerns whether the declarant has made a previous identification. The opponent may attempt to impeach the witness generally or with respect to this particular statement. Eliciting other details of the declarant's statement, however, goes beyond the scope of the direct examination; the sole purpose of the testimony is to show that an identification had been made prior to the alleged motive to fabricate. The details of Gilliam's entire statement may be relevant to her veracity and be properly admitted in her cross-examination, *see, e.g., Morris v. United States,* 398 A.2d 333, 339 (D.C.1978); *Waller v. United States,* 389 A.2d 801, 810 (D.C.1978), *cert. denied,* 446 U.S. 901, 100 S.Ct. 1824, 64 L.Ed.2d 253 (1980); they transcend, however, the limited relevance of this exception to the hearsay rule and its use in the examination of Catlett.[4]

Brooks contends only that this deferral of Catlett's examination violates the rule of completeness. The government responds that the rule "is not absolute. . . . [I]f the material offered is not independently relevant, the trial court has discretion to exclude any additional parts of the utterance unless they concern the same subject and explain the part already admitted." *Warren v. United States,* 515 A.2d 208, 210 (D.C.1986) (citing *Life Insurance Co. of Georgia v. Dodgen,* 148 Ga.App. 725, 729, 252 S.E.2d 629, 633 (1979); 7 J. WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 2113, at 656 (Chadbourne Rev.1878)). This reasoning fails, however, because, strictly defined, the details of Gilliam's account are independently relevant to her credibility and the Brooks' role in the murder; the trial judge would be in error if they were excluded altogether. *Cf. Warren, supra,* 515 A.2d at 210–11. Nonetheless,

---

**3.** Brooks' hearsay objection to Catlett's testimony about Gilliam's prior statement was overruled by the trial judge on the ground that it was within the recent fabrication exception to the hearsay rule. The government also argued that the statement was admissible as an identification. When defense counsel's cross-examination of Catlett was curtailed, counsel acquiesced in the judge's ruling that she would have to wait to call Catlett as her own witness and did not advance the rule of completeness as a theory in support of more extensive cross-examination.

As to this ruling Brooks is thereby restricted to plain error review on appeal, but we hold that the trial judge's ruling was nonetheless correct.

**4.** Indeed, Brooks initially objected to the elucidation of Gilliam's entire account, and later sought to elicit only those aspects of Gilliam's account that, based on Catlett's grand jury testimony, appeared to conflict with Gilliam's version at trial.

because testimony as to these details was irrelevant to the matters elicited on direct examination of Catlett, and apparently minimally relevant to the main issues in the case, see discussion, *infra*, the trial judge must enjoy a wide range of discretion in order to be able to control the manner in which this evidence was introduced. Brooks' reliance on *United States v. Walker, supra*, 652 F.2d 708, where a conviction was reversed upon retrial because portions of a witness' testimony explaining his answer were excluded, is misplaced; no such event occurred here.

Brooks has erroneously characterized the trial judge's second ruling. Although the judge initially required that Gilliam testify about these details before Catlett could be called,[5] he eventually changed his mind after extensive debate and granted Brooks' request.[6] After a consultation with Brooks, defense counsel informed the trial court that, in light of the ruling on the hostile status of Catlett,[7] see note 6, *supra*, she would decline to call her as a witness.

A strategic defense decision was thereby made that excluded the very evidence Brooks now contends was so essential to his case. Under these circumstances, his pleas to this court must fail; his "failure to [call the witness] is inconsistent with his instant assertions of prejudice." *Waller, supra*, 389 A.2d at 811; *see also Morris, supra*, 398 A.2d at 339 (no prejudice when court wrongfully restricted cross-examination but defendant called same witness).

Moreover, even if the evidence is examined, this court would be hard pressed to find either ruling an abuse of discretion. The only arguable inconsistencies in Catlett's grand jury testimony are that Gilliam stated that (1) she had originally left home to catch a cab and go uptown, (2) Brooks was angered over the loss of both cocaine and money, (3) Brooks had discovered hidden cocaine in Mackenheimer's vagina, and (4) Gilliam had initially assisted in tying up Mackenheimer. The first two details are insignificant and the third actually helps explain why Brooks would have focused his violence on Mackenheimer instead of the others. Gilliam's role might admittedly have been of legitimate interest to the jury, but her admission does no more than establish that she might have submitted to Brooks' order only by placing the rope around Mackenheimer, but still refused to strangle her. Nothing in this testimony changes the essential fact that Gilliam identified Brooks as the sole voluntary aggressor and ultimate murderer. Finally, all of these details are just that: insignificant events that could easily be misremembered without affecting the substance of the transaction.

## II

Shortly after his conviction, Brooks filed a motion, pursuant to SUPER.CT.CRIM.R. 33, alleging that he was entitled to a new trial on three separate grounds: newly discovered evidence, jury contamination, and the failure of the government to disclose all of the impeachable convictions of Robert Bennett. (Evidence supporting the second and third claims was also newly discovered.) The trial judge held thorough evidentiary hearings on the jury contamination and exculpatory evidence issue; the government conceded that certain impeachable convictions had improperly not been revealed and provided a full list at the hearing. In a thirty-page opinion, the judge made express findings of fact and rulings of law, and denied each of Brooks' motions.

### A. *Newly Discovered Exculpatory Evidence.*

 Brooks claims the trial judge erred in ruling that the hearsay testimony of a

---

5. Nonetheless, because these details are primarily relevant to Gilliam's credibility, such a restriction would seemingly serve the controlled and logical flow of information in the trial.

6. The judge stated:
 Well, I'll tell you what I'm going to do. I'm going to let you bring in Ms. Catlett. Now, of course, there might be rebuttal after you get through, with Ms. Gilliam. There could be. I am not, however, accepting the fact that she's hostile [so leading questions are inappropriate until Catlett proves to be hostile].

7. Brooks does not challenge this ruling on appeal.

fellow inmate (Mack) at the D.C. Jail would not have been admissible at Brooks' trial as a statement against penal interest, *Laumer v. United States*, 409 A.2d 190, 199 (D.C.1979) (en banc); *see also* FED.R. EVID. 804(b)(3), and that the evidence was not of such a nature that an acquittal would likely result from its use. *Smith v. United States*, 466 A.2d 429, 432–33 (D.C. 1983); *Wright v. United States*, 387 A.2d 582, 587 (D.C.1978). Mack, a former friend of Edmunson, claimed Edmunson had said he and his girlfriend had killed a woman named Candy (the victim's nickname) over money owed for cocaine by stabbing her with a pair of scissors, hitting her with a hammer, and choking her; Brooks was not mentioned as a participant.

The trial judge's finding that Edmunson had not made the statement is not clearly erroneous, *Laumer, supra*, 409 A.2d at 203, and hence, no basis exists for any further inquiry. *Id.* at 199. The judge had the opportunity to assess Mack's demeanor and found that he was not credible because of his extensive record of serious crimes, the absence of corroborating witnesses to Edmunson's statement, and the strong motives for fellow inmates to fabricate evidence to help each other. *See United States v. Alexander*, 139 U.S.App.D.C. 163, 165, 430 F.2d 904, 906 (1970) (several inmates would not be allowed to testify that declarant had confessed while in prison). The judge noted that Mack's knowledge of certain details was easily explained by the opportunity to collude with Brooks, and that Mack had not come forward until he heard others discussing the crime.[8]

■ To assure an adequate appellate record, the judge further ruled that, even if the evidence had been admissible, Brooks would not have been entitled to a new trial because the evidence would not likely have produced an acquittal. *See Smith, supra*, 466 A.2d at 432–33. The judge's resolution

of this mixed question of fact and law was clearly correct. The jury would have been confronted with Mack's credibility problems. *Alexander, supra*, 139 U.S.App.D.C. at 165, 430 F.2d at 906. But even if they believed Mack, they would not have been likely to acquit Brooks. Edmunson's version of his role in the murder would likely have been viewed as a boast. Even if believed, it does not necessarily exonerate Brooks for his role in the murder, which was well chronicled by Gilliam's testimony.

### B. *Jury Contamination.*

Brooks next claimed that one of his friends had talked with two of the jurors during the trial, that his friend had told the jurors about his criminal record, and that the jurors had expressed the view that he was guilty. The trial judge held an initial informal hearing and a second formal hearing.

The most understandable version of the testimony of Brooks' friend, Lenard Floyd, is as follows: Floyd testified that he had been in the courthouse pursuant to his own domestic matter without knowledge that Brooks was on trial at the time. (He could not remember the name of the judge or further clarify the domestic matter.) He stated that he saw Isaiah Lurry, whom he recognized because he had previously done denture repair work for Lurry and his mother-in-law, and that he gave Lurry a ride from the courthouse to his car three or four times. On the first three trips, Lurry had simply said that he was a juror on a murder case and that it looked like the man was guilty. Floyd said that he later learned that Brooks was on trial at the time and walked into the courtroom, where he learned for the first time that Lurry and another young lady, to whom he had also given a ride on two occasions, were on the jury. On that day, he gave Lurry and the young woman another ride home; he testi-

---

8. Brooks asked this court to review Edmunson's grand jury testimony for evidence of this statement in reviewing the trial judge's denial of defense counsel's midtrial request for disclosure of this grand jury testimony. We have done so and find no error by the trial judge in ruling on the inadmissibility of Mack's hearsay, *see Lau-*

*mer, supra,* 409 A.2d at 203, and no basis for reversal of the convictions because of denial of the discovery request at trial, *see Lewis v. United States,* 393 A.2d 109, 114–15 (D.C.1978), *aff'd on reh'g,* 408 A.2d 303 (D.C.1979), or in the denial of the motion for a new trial. *See Derrington v. United States,* 488 A.2d 1314, 1339 (D.C.1985).

fied that he thought he told Lurry that he knew Brooks and that also he might have said that Brooks had been incarcerated before; he later said that he could not recall whether he told Lurry that Brooks had been in jail, but changed his mind again when the judge later questioned him. Floyd was impeached with a 1979 conviction for assault with a deadly weapon; he also admitted having known Brooks since he was a little boy.

Lurry admitted talking to Floyd and accepting a ride from Floyd on two occasions during the trial. He unequivocally denied after repeated cross-examination, however, that he had ever discussed the case with Floyd, that he was ever aware that Floyd knew Brooks or that Floyd ever mentioned Brooks' previous incarceration. They had mainly discussed the fact that Lurry's mother-in-law owed Floyd some money for dental repair work. Lurry further testified that another juror, Iris Solomon, had been in the car on both occasions and that she had also never discussed the case in the presence of Floyd. Solomon corroborated Lurry's testimony.

Under *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), "the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Id.* at 215, 102 S.Ct. at 945. This court has relied on *Smith v. Phillips* in a civil case. *See Shannon & Luchs Management Co. v. Roberts*, 447 A.2d 37, 39–43 (D.C.1982). Brooks, citing *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), maintains that, "[i]n a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial." *Id.* at 229, 74 S.Ct. at 451. *Smith v. Phillips* was also a criminal case, however, that was in the federal courts on a habeas corpus petition. The Court in *Smith v. Phillips* also seemed to accept the *Remmer* holding that a presumption of prejudice might be appropriate in certain cases, *Smith v. Phillips, supra*, 455 U.S. at 215, 102 S.Ct. at 945, such as those involving bribery. *Cf. United States v. Littlefield*, 752 F.2d 1429, 1431

(9th Cir.1985) (the government has the burden of rebutting a presumption of prejudice); *but see United States v. Pennell*, 737 F.2d 521, 532 (6th Cir.1984) (*Smith v. Phillips* overruled *Remmer* generally), *cert. denied*, 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985).

■ Even when afforded a presumption of prejudice, however, Brooks loses under the facts of this case. The controversy over the appropriate standard was presented to the trial judge, who found no necessity to reach the issue because he expressly found, as a matter of fact, that the jurors neither discussed the case nor learned of Floyd's association with Brooks or of Brooks' prior incarceration. These factual findings are entitled to great deference by this court and, under the circumstances of this case, the denial of the motion for a new trial did not constitute an abuse of discretion. *See Shannon & Luchs Management Co., supra*, 447 A.2d at 43.

The record supports the judge's conclusion that Floyd's testimony was "inconsistent, vague and equivocal." When pressed as to a detail, he consistently concluded that he could not recall what transpired and often contradicted himself on essential points. Moreover, Floyd had a clear motive to deceive the court and admitted visiting Brooks in jail after the trial and discussing the juror contact. Finally, the judge observed that Floyd "was often defensive and appeared either unwilling or not interested in providing a full explanation," and concluded that his "mannerisms and demeanor were ... inconsistent with one who testifies truthfully." By contrast, the testimony of the two jurors was "internally consistent, clear and unequivocal.... Both were firm and consistent in denials ... and surprised [at the allegations]." In sum, the basis for discrediting Floyd's testimony was strong, and certainly capable of withstanding appellate review. *Id.*

### C. Undisclosed Impeachable Convictions.

■ Brooks also claimed that the government failed to disclose all of Robert Bennett's impeachable convictions pursuant to defense request. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196,

10 L.Ed.2d 215 (1963); *Lewis, supra* note 8, 393 A.2d at 115. The government admits error in the use of a ten-year old conviction for contributing to the delinquency of a minor.[9] In addition to this conviction, Bennett could at least have been impeached with the conviction for theft and failure to appear.[10] The trial judge ruled that there was no "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3384, 87 L.Ed.2d 481 (1985)). This decision was reasonable. *Derrington, supra* note 8, 488 A.2d at 1339 (citation omitted) (standard of review regarding *Brady* material).

Bennett was an employment counselor. His testimony could only determine when Mackenheimer received, approximately five days before her death, information about employment which she had written on a piece of paper that was found in her apartment. The piece of paper was from Bennett's pocket calendar and contained his name, address, and telephone number. Brooks' fingerprint was found on that piece of paper. As the defense pointed out at trial, Brooks could have placed his fingerprint on the paper at an earlier time because Mackenheimer possessed the paper, as opposed to the information on it, prior to her meeting with Bennett. The paper and the fingerprint would nonetheless have been introduced as evidence; Bennett's testimony was not essential and only a collateral aspect of the government's case [11] and he was in fact impeached with one conviction.

Accordingly, the judgments are affirmed.

---

**9.** The government represents that the use of this conviction was erroneous because that case was ultimately dismissed.

**10.** The admissibility of Bennett's conviction of driving with a revoked license was disputed below, and Brooks also argued that Bennett could have been cross-examined about potential bias resulting from any pending bad check charges. These issues are irrelevant in light of our ultimate appellate determination.

**11.** Brooks contended at oral argument that the government's reliance during closing arguments on the fingerprint evidence reveals how significant Bennett was to its case. However, the evidence before the jury was that Brooks had searched the victim's purse and had thrown papers from her purse on the floor. The paper with Brooks' fingerprints was found next to the victim's body. Accordingly, the government had other sufficient evidence on which to argue the significance of Brooks' fingerprint.