Thomas JOHNSON, Jr., and Patrick L. Baucum, Appellants

v.

UNITED STATES, Appellee.

No. 95–CF–1464, 96–CF–459 and 99–CO–38.

District of Columbia Court of Appeals.

Argued Jan. 9, 2002.
Decided April 10, 2003.

Frederick J. Sullivan, Bowie, MD, appointed by the court, for appellant Johnson.

William T. Morrison, Silver Spring, MD, appointed by the court, for appellant Baucum.

Patricia A. Heffernan, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher and Roy W. McLeese, III, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY, FARRELL, and WASHINGTON, Associate Judges.

TERRY, Associate Judge:

After a jury trial, appellants Johnson and Baucum were convicted of second-degree murder while armed, assault with intent to kill while armed, possession of a firearm during a crime of violence, and carrying a pistol without a license. On appeal both appellants contend that the trial court erroneously allowed the government to introduce a witness' prior statement for the purpose of impeachment. In addition, appellant Baucum claims that the court erred in permitting the government to call that witness for the sole purpose of putting the impeaching evidence before the jury. Baucum further argues that the trial court erred when it failed to instruct the jury *sua sponte* that an accomplice's testimony should be viewed with "special suspicion." Finally, both appellants maintain that the evidence was insufficient to convict them of the various crimes.[1] We affirm.

I

### A. *The Shooting and Its Aftermath*

At about 3:00 p.m. on December 19, 1992, Willie Washington and Earl Nelson were sitting in Washington's car, which was stopped at a traffic light at the corner of Naylor Road and Alabama Avenue, S.E. Another car, carrying three people, swerved into their lane as if it were going to hit them and then stopped just ahead of them at the light. Washington pulled forward and then stopped abreast of the second car to see who was in it. Before either Washington or Nelson could identify the occupants of the other car, the person seated in the front passenger seat reached downward, pulled out a gun, opened the window slightly, and began firing at Washington and Nelson. The gunman continued firing until his gun made a clicking sound, and then the car pulled away. Both victims were gravely wounded in the shooting; Washington died of his wounds.

---

1. Baucum also noted an appeal (No. 99–CO–38) from an order denying his *pro se* motion to vacate his sentence under D.C.Code § 23–110 (2001) on the ground of ineffective assistance of counsel. Both in his brief and at oral argument, however, he withdrew this claim, so we do not address it.

Julius Seawright, an off-duty police officer, watched these events from inside his own car, which was two cars behind Washington at the traffic light. While waiting at the light, he saw a hand holding a shiny nine-millimeter gun with a black grip reach out the window of the second car and fire into Washington's car. Officer Seawright thought he saw two people in the second car, which drove away at a normal speed when the light changed to green. He followed that second car, but lost it after seven or eight blocks. He then broadcast a description of the car and its license number to a police dispatcher.

The police identified the car as a blue Chrysler registered to Louise Baucum, who lived on Minnesota Avenue, S.E. When the police contacted her, Mrs. Baucum told them that she owned the car and that she had lent it to her son, Patrick Baucum, about six months earlier. Mrs. Baucum also informed the police that she owned a house in the 2300 block of 13th Place, N.E. Four officers immediately set up a surveillance of that house, and one of them located Mrs. Baucum's car, which was parked nearby on the street. After about fifteen or twenty minutes, the officers saw Patrick Baucum leave the house, and ten minutes later they saw him return with two men who were later identified as Thomas Johnson, Jr., and Lamont Heard. Johnson walked past the officers and continued out of sight, while Baucum and Heard walked to Baucum's mother's car. Baucum handed Heard a set of keys, which Heard used to open the trunk. At that point, the officers came forward from their observation post and arrested both Baucum and Heard.

The police later executed a search warrant at the house on 13th Place. There they found mail addressed to Patrick Baucum and a semi-automatic "Mac-11" assault pistol containing five rounds of am-

munition. The Mac-11 was not registered, and Baucum did not have a license to carry it. After his arrest, Baucum told the police that he had been at the Lorton correctional facility visiting a friend at the time of the shooting. At trial, a corrections officer testified that Baucum had indeed been visiting someone at Lorton that day, but that he left after visiting hours ended at 1:00 p.m.

A few weeks later, the police executed an arrest warrant for Tommie Johnson. The arresting officers found him in an apartment on Butler Street, S.E., hiding in a closet under a pile of laundry. Officer Richard Finelli ordered him to reveal his hands, and after hesitating for a moment, Johnson did so. At that moment the officer heard the sound of a metallic object hitting the floor. After removing Johnson from the closet, Officer Finelli found on the floor a stainless steel Smith & Wesson nine-millimeter semi-automatic pistol. The pistol was not registered, and Johnson did not have a license to carry it.

The police also processed the physical evidence from the shooting. From Mrs. Baucum's blue Chrysler, they recovered a latent fingerprint which matched a print of appellant Johnson. Investigators also recovered a spent nine-millimeter casing from the floor of the car behind the driver's seat which matched the Mac-11 pistol found at Baucum's home. In addition, two nine-millimeter casings found at the scene of the shooting matched the Smith & Wesson semi-automatic found on the closet floor next to Johnson when he was arrested. Two other casings recovered at the scene could not be matched with the Smith & Wesson, but also could not be excluded. Another shell casing found at the scene matched the Mac-11.

The victims' car had twelve bullet holes in it. Police recovered five bullets and fragments of two additional bullets from

various places in the car. All of the bullets could have come from the Smith & Wesson, but a positive match could not be made for any of them. In addition, the door on the driver's side contained a fragment that could have come from the Mac–11, but it too could not be positively matched to that gun.

Willie Washington died from nine gunshot wounds. The medical examiner found two bullets in the folds of his clothing and three bullets in his body. Four of those bullets had markings consistent with the Smith & Wesson, but they could not be positively identified with that weapon. The remaining bullet was positively matched to the Smith & Wesson.

Earl Nelson spent almost four months in the hospital and lost his left lung as a result of the shooting. While he was in the hospital, the police showed him a group of photographs, and he selected one picture of someone who he believed was the gunman. The record before us does not disclose who that was, but apparently it was not either appellant. Later, at a lineup, Nelson identified a man whom be believed to be the shooter. That man, however, was a police officer who had been placed in the lineup as a "filler." Nelson did not identify anyone at trial.

When the police took Lamont Heard to headquarters on December 19, 1992, he agreed to give a statement. Detective Cleora Sharkey typed Heard's statement verbatim into the computer while Heard spoke. As she was typing, Heard watched her so closely that, she said, he made her uncomfortable. Detective Eric Gainey was also present with Heard and Detective Sharkey through the whole process of taking the statement. According to Detective Gainey, Heard appeared to read every word of the statement off the computer screen as Detective Sharkey typed it. Detective Sharkey then printed the statement, gave it to Heard to read, and allowed him to make corrections. Heard read the statement and signed the last page.

Detective Gainey testified that Heard initially denied any involvement with the shooting when the arresting officers brought him to police headquarters. Then Heard gave a second version of events to another police officer before the interview with Detectives Sharkey and Gainey. Finally, Heard told Sharkey and Gainey that there were three people in the car, and he identified Baucum and Johnson as the gunmen when the detectives showed him photographs of those two men.

### B. *The Testimony of Lamont Heard*

Heard stated[2] that on the day of the shooting he was driving Baucum's mother's car. When he stopped for a red light at the intersection of Alabama Avenue and Naylor Road, Darryl Arrington was the only passenger in the car with him. When a blue car pulled up alongside their car, Arrington uttered an oath, reached under the seat, pulled out a Mac–11, and began firing it. In addition, Arrington had a nine-millimeter pistol in his waistband. Heard hid under the dashboard, and from that position he thought he heard Arrington firing both guns.

Heard then drove Arrington to 13th Place, N.E. While driving there, he noticed a black car following him. He parked the car near Baucum's home, and Arrington left. Heard then went to a nearby carry-out to meet Baucum because Heard had Baucum's only set of keys, and Baucum could not get into his home or drive his car. The police stopped and arrested Heard and Baucum at around 4:30 p.m. as

2. Heard testified under a grant of immunity.

they were walking back to Mrs. Baucum's car.

After Heard gave this testimony, the prosecutor confronted him with his earlier statement to the police. Heard denied having read it, and said that he had signed the statement and returned it to Detective Sharkey without knowing what it said. Heard also claimed that Sharkey threatened to use her gun on him while he was making the statement if he failed to cooperate with the police. He said he told the police that Arrington was the shooter and that Baucum took the bus to Lorton that day. Heard confirmed that the police showed him pictures of Baucum and Johnson, but he denied that he identified them as the gunmen. He testified that he only identified Baucum to the police as the owner of the car that he drove on December 19.

After the prosecutor had impeached Heard with his prior statement, the court instructed the jury that the statement was to be used solely to assess the credibility of Heard as a witness and not for its truth. The court told the jury:

> You have heard evidence ... that the witness here, Mr. Lamont Heard, made statements on an earlier occasion, and the statements that he made on an earlier occasion may be inconsistent with the testimony he is giving here at trial. The earlier statements are brought to your attention to help you in evaluating his believability, credibility in court.
>
> In other words, if on an earlier occasion he made statements that are inconsistent with his testimony here in court, you may consider the inconsistency in judging his credibility as a witness at this trial.
>
> I want to emphasize as strongly as I can on this point, you may not consider his earlier statements as proof that what he said, the earlier statements, were

true. It is for you to decide whether a witness made a statement on an earlier occasion and whether it was in fact inconsistent with the testimony the witness has given here in court.

## II

Appellants' principal claim of error is that the court improperly allowed the prosecutor to impeach Heard with his prior statement to the police. Under the common law, a prior inconsistent statement can be used to impeach a witness when the witness testifies at trial in a manner contrary to that statement; however, the substance of the prior statement cannot be used as evidence of its truth. This rule is well established in the District of Columbia, although it has been somewhat modified by statute. *See Bartley v. United States*, 115 U.S.App. D.C. 316, 318, 319 F.2d 717, 719 (1963); *Byrd v. District of Columbia*, 43 A.2d 46, 48 (D.C.1945).

■ In addition, and contrary to the traditional impeachment rule, District of Columbia case law has long recognized a hearsay exception for prior out-of-court identifications. This court and our sister federal appellate court have consistently upheld the admission of such identification evidence when the identifier is available for cross-examination. *See Morris v. United States*, 398 A.2d 333, 336–338 (D.C. 1978); *accord, e.g., Dancy v. United States*, 745 A.2d 259, 269 (D.C.2000); *Paris v. United States*, 515 A.2d 199, 205 (D.C.1986); *Harley v. United States*, 471 A.2d 1013, 1015 (D.C.1984); *Rice v. United States*, 437 A.2d 582, 583 (D.C.1981); *Clemons v. United States*, 133 U.S.App. D.C. 27, 39–40, 408 F.2d 1230, 1242–1243 (1968) (en banc), *cert. denied*, 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969). "Such identification evidence is admissible through the testimony of either the identi-

fier or witnesses present at the prior identification." *Dancy*, 745 A.2d at 269 (citing cases). If the witness recants his identification in his direct testimony, this court has held that the prior out-of-court identification becomes inadmissible. *See Fletcher v. United States*, 524 A.2d 40, 43–44 (D.C.1987); *In re L.D.O.*, 400 A.2d 1055, 1057–1058 (D.C.1979). More recent cases, however, have narrowed this principle by allowing evidence of a prior identification to be heard by the jury in certain situations. *See, e.g., Scales v. United States*, 687 A.2d 927, 931 (D.C.1996) (prior identification admissible when witness affirmed his identification on direct, but then recanted on redirect).

■ Finally, there is a statute governing impeachment of witnesses and the use of a prior identification as substantive evidence. D.C.Code § 14–102(b) (2001) provides:

> A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is (1) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a

trial, hearing, or other proceeding, or in a deposition, or (2) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the witness of recent fabrication or improper influence or motive, or (3) an identification of a person made after perceiving the person. Such prior statements are substantive evidence.

Section 14–102(b) mirrors the language of Federal Rule of Evidence 801(d)(1). Only the last sentence of section 14–102(b), "[s]uch prior statements are substantive evidence," is an addition to the language of the federal rule.[3] Like Rule 801(d)(1), section 14–102 creates three categories of statements that are deemed non-hearsay. For the purposes of the instant case, only the third category, "an identification of a person made after perceiving the person," is relevant.

Because the District of Columbia statute and the corresponding federal rule share the same text, this court in *Sparks v. United States*, 755 A.2d 394 (D.C.2000), interpreted section 14–102(b)(3) in light of federal court interpretations of the federal rule. In *Sparks* we adopted the Supreme Court's reasoning in *United States v. Ow-*

---

**3.** In 1995 the Council of the District of Columbia rewrote the earlier version of this statute by creating three classes of statements that are not deemed to be hearsay. At the time of appellants' trial, D.C.Code § 14–102(b) had been amended, but contained a typographical error. It read in relevant part as follows, with the error italicized:

> A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is ... (2) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the witness of recent fabrication or improper influence or *motive or an identification* of a person made after perceiving the person. Such prior statements are substantive evidence.

D.C.Code § 14–102(b) (1995). Nearly a year later, section 14–102 was amended to correct the typographical error in subsection (b). That amendment, effective in April 1996, replaced the phrase "motive or an identification" with the phrase "motive, or (3) an identification." *See* D.C. Law 11–110, § 23, 43 D.C. Register 537 (1996); COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE Of THE WHOLE, REPORT ON BILL No. 11–485, at 5 (November 21, 1995).

Appellants do not suggest, nor could they, that the 1996 amendment substantively changed the meaning of the 1995 statute. Likewise, they do not and cannot argue that application of the 1995 statute to them raises any *ex post facto* issues even though their offenses were committed in 1992. *See Jones v. United States*, 719 A.2d 92, 93–94 (D.C. 1998).

*ens,* 484 U.S. 554, 562, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988), that, " 'given adequate safeguards against suggestiveness, out-of-court identifications [are] generally preferable to courtroom identifications.' " *Sparks,* 755 A.2d at 399 (citing *Owens*). Likewise, we pointed out that modern federal case law allows the admission of a prior statement of identification under Federal Rule 801(d)(1)(C) regardless of whether the witness can repeat the identification, or is uncertain, or recants the prior identification at trial. *See United States v. Anglin,* 169 F.3d 154, 159 (2d Cir.1999); *United States v. Salameh,* 152 F.3d 88, 125 (2d Cir.1998); *Samuels v. Mann,* 13 F.3d 522, 527 (2d Cir.1993); *United States v. O'Malley,* 796 F.2d 891, 899 (7th Cir.1986); *United States v. Lewis,* 565 F.2d 1248, 1252 (2d Cir.1977).

In *Sparks* the victim of an assault identified two lifelong acquaintances as the perpetrators of the assault to the police shortly after the incident and several times thereafter in the months before trial. However, before the grand jury and again at trial, the victim testified that he could not identify his assailants. At trial the prosecutor asked him whether he recalled speaking to a police officer about the incident and what he told her at that time. When the victim said he did not remember any of the details of the incident, the government called two police officers who had spoken with him shortly after the assault to confirm his prior identifications. The officers testified that the victim had identified his two assailants (who were brothers) by their names and addresses and had given descriptions of both men and of their respective cars. We held that the officers' testimony about the victim's prior identifications was admissible, in the discretion of the trial court, and that the court had not abused its discretion in admitting it. 755 A.2d at 401. In so holding, we noted that the trial court had carefully limited the government's impeachment questions to confirming the identity of the assailants and had not allowed questions about the circumstances of the assault. *Id.* at 401 n. 8. We also pointed out that the victim was available for cross-examination, and that his initial identification was "trustworthy and reliable" (as the trial court found) because the victim had "lived two doors away from the Sparks family as he was growing up" and had seen and recognized his assailants' faces as they struck him in the head with their guns. *Id.* at 400.

In the case at bar, the parties and the court discussed before trial the fact that Heard's prior statement was an identification that tied both appellants to the shooting. The government proposed to introduce Heard's statement through the prior identification exception to the hearsay rule. *See Morris,* 398 A.2d at 336–338. At trial, however, the parties considered the statement only as an out-of-court prior inconsistent statement. Both the parties and the court interpreted D.C.Code § 14–102 as codifying the established rule which allowed impeachment with such a statement. Similarly, both the parties and the court focused on the fact that Heard's prior statement was not made under oath, but was inconsistent with his proposed testimony at trial. As a result, the court ruled that the prior statement did not come within the ambit of section 14–102(b)(1), and it applied the traditional rule that a prior out-of-court statement may be used solely to impeach a witness' credibility and not as substantive evidence. The discussion did not address the issue of whether the statement was a prior statement of identification admissible under either the *Morris* hearsay exception or section 14–102(b)(3).

Nevertheless, notwithstanding the trial court's limiting instruction (see

page 556, *supra*), we hold that the evidence of Heard's prior statement was admissible without limitation to prove the identity of the two gunmen. The statute compels this holding. If the declarant testifies and is available for cross-examination, section 14–102(b)(3) excludes from the definition of hearsay "an identification of a person made after perceiving the person," which is what Heard's statement was, and the last sentence of section 14–102—the one respect in which our statute differs from the federal rule—speaks categorically: "Such prior statements are substantive evidence." Thus we find no error in the admission of Heard's statement, which the jury was entitled to consider as substantive evidence despite the limiting instruction.[4] Indeed, in light of the statute, it necessarily follows that the trial court erred in giving the instruction. Appellants are in no position to complain about it, however, because the error favored them and prejudiced the government.[5]

### III

Baucum also contends that the government's presentation of Heard's direct testimony was a subterfuge intended merely to get Heard's prior statement before the jury. Because, as we have held, the prior statement was admissible independently as substantive evidence, and because Heard's direct testimony was otherwise unobjectionable on hearsay or relevancy grounds, it is difficult to see the logic of this argument. But we reject it in any event.

4. Nor can appellants claim that, even if portions of the prior statement were admissible as an identification, the trial court nonetheless erred in permitting the government to place other portions of the statement before the jury. To be understandable and therefore probative, an identification must have context, and the circumstances of Heard's identification which the jury learned about from his prior statement were relevant to the identification. *See Porter v. United States*, No. 97–

Heard was the driver of the getaway car and an eyewitness to the shooting. He testified to the time and place of the shooting and described both the victims and the types of weapons used. He also said that he was followed as he drove away after the shooting and that he parked the car at the 13th Place address. The government was entitled to call Heard as a witness even though it could reasonably expect that he would testify contrary to his earlier statement about the identity of the gunmen. In such a situation, impeachment with that statement was permissible and proper. *See Bradley v. State*, 333 Md. 593, 604, 636 A.2d 999, 1005 (1994) ("in instances where a witness's testimony is not reasonably divisible into clearly separate areas of inquiry, the State may properly impeach any portion of the witness's testimony that disfavors the government's case" (citations omitted)). "When a government witness provides evidence both helpful and harmful to the prosecution, the government should not be forced to choose between the Scylla of foregoing impeachment and the Charybdis of not calling the witness at all." *United States v. Kane*, 944 F.2d 1406, 1412 (7th Cir.1991).

Baucum further asserts that the court erred by not instructing the jury *sua sponte* that Heard's statement should be viewed with "special suspicion" because Heard was an accomplice to the crime. We review this claim only for plain error because Baucum did not request such an instruction during the trial. *See Gilliam v. United States*, 707 A.2d 784, 785–786

CF–134, slip op. at 14–15 (D.C. June 19, 2003).

5. We need not decide in this case whether the 1995 enactment of the amended section 14–102 amounted to a legislative overruling of such pre-amendment cases as *Fletcher* (1987) and *L.D.O.* (1979). It is evident, however, that at the very least, both the statute and the more recent *Sparks* case have cast a cloud on those decisions.

(D.C.1998) (en banc). The trial court was under no duty to give the instruction when appellant failed to request it. *See Allen v. United States,* 495 A.2d 1145, 1150–1151 (D.C.1985) (en banc); *Johnson v. United States,* 387 A.2d 1084, 1088 (D.C.1978) (en banc); Super. Ct.Crim. R. 30. We find no plain error; indeed, we find no error at all.[6]

## IV

 Finally, both appellants claim that the evidence was insufficient to convict them. In considering an insufficiency claim, this court views the evidence in the light most favorable to the government, recognizing the jury's right as fact-finder to weigh the evidence, to determine the credibility of witnesses, and to draw justifiable inferences from the evidence. *See, e.g., Nelson v. United States,* 601 A.2d 582, 593 (D.C.1991); *Curry v. United States,* 520 A.2d 255, 263 (D.C.1987). The government is not required to negate every possible inference of innocence. *Jones v. United States,* 625 A.2d 281, 288 (D.C.1993). Reversal is warranted only if there is no evidence whatever upon which a reasonable trier of fact might fairly find guilt beyond a reasonable doubt. *Nelson,* 601 A.2d at 593 (citing *Williams v. United States,* 357 A.2d 865, 867 (D.C.1976)).

 A reasonable jury could find that the evidence tied both appellants to the shooting despite Heard's testimony that they were not involved. The government, after all, succeeded in impeaching Heard's testimony about the identity of the gunmen, and the jury could reasonably disregard that testimony. Independently of anything Heard said, there was forensic evidence linking the two guns recovered by the police—the Mac–11 and the Smith & Wesson—to the scene of the crime. In turn, the guns were linked to each of the appellants. The police found both Johnson and the Smith & Wesson pistol in the same location at the time of Johnson's arrest. Johnson was hiding under a pile of laundry in the closet, and the pistol was on the floor next to him. In addition, the police discovered the Mac–11 in the home where Baucum—in the company of Johnson and Heard—was spotted by the police shortly after the shooting, where Baucum received mail, and where he parked his car. Furthermore, the car involved in the shooting was identified with Baucum (it was owned by his mother), and it too was discovered near the home where the Mac–11 was recovered by the police. Johnson's fingerprint was found in the car, which connected him with Baucum. This evidence, considered as a whole, was sufficient to support both appellants' convictions.

## V

Baucum's appeal from the denial of his § 23–110 motion (No. 99–CO–38) is dismissed as abandoned. *See In re K.M.T.,* 795 A.2d 688, 691 (D.C.2002). In the two direct appeals (Nos. 95–CF–1464 and 96–CF–459), the convictions of both appellants are in all respects affirmed.

*It is so ordered.*

---

**6.** There is a standard instruction on accomplice *testimony,* but it falls far short of saying that such testimony should be viewed with "special suspicion." *See* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 2.22 (4th ed.1993) (accomplice testimony "should be received with caution and scrutinized with care"). Although we have said that giving a cautionary instruction on accomplice testimony is "the usual practice," *Price v. United States,* 531 A.2d 984, 986 (D.C. 1987) (citing instruction No. 2.22), we have also held that the failure to give such an instruction *sua sponte,* when none was requested, was not plain error. *Ali v. United States,* 581 A.2d 368, 377–378 (D.C.1990).