**Larry D. BROWN, Appellant**

v.

**UNITED STATES, Appellee.**

**Nos. 99–CF–1544 to 99–CF–1546.**

District of Columbia Court of Appeals.

Argued Oct. 14, 2003.
Decided Jan. 8, 2004.

Matthew C. Leefer, Boonsboro, MD, appointed by the court, for appellant.

Rozella A. Oliver, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher, Barbara J. Valliere, and Julieanne Himelstein, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY and REID, Associate Judges, and NEWMAN, Senior Judge.

TERRY, Associate Judge:

After a jury trial, appellant was convicted of six counts of first-degree child sexual abuse,[1] one count of escape from a halfway house while on pretrial release,[2] and one count of failure to appear in court when required, a violation of the Bail Reform Act ("BRA").[3] There were three complainants in the sexual abuse counts; two were appellant's stepdaughters, and one was his wife's niece. Before this court, appellant contends (1) that the trial court erred in admitting the complainants' statements to police officers and medical personnel that identified him as their assailant; (2) that the court abused its discretion by limiting the cross-examination of one of the victims (the niece) about her prior sexual activity and about her knowledge of sexual assault accusations made by another witness (the victims' twelve-year-old cousin) against a third party; (3) that the court abused its discretion by admitting testimony that appellant beat one of the complainants and testimony about a medical examination of one of the stepdaughters; and (4) that the court abused its discretion by denying appellant's request for a special jury instruction on the testimony of a child witness.[4] We reject

1. D.C.Code § 22–4108 (1996), recodified as D.C.Code § 22–3008 (2001).

2. D.C.Code § 22–2601(a)(1) (2001).

3. D.C.Code § 23–1327(a) (2001).

4. Appellant makes no claim of error regarding either the escape conviction or the BRA conviction.

each of these contentions and affirm all of the convictions.

## I

D.T.[5] has three daughters, Sh. T., S.T., and E.T. Sometime in the late 1980s D.T. married appellant, and she, the children, and appellant lived together as a family from that point on, with the children calling appellant "Daddy." In September 1993 appellant began having sexual intercourse with twelve-year-old S.T. The following year, appellant began having sexual intercourse with E.T.; she was then ten years old.[6]

After these initial encounters, sex between appellant and his two youngest stepdaughters occurred regularly. Usually, appellant would call S.T. or E.T. (but never both at the same time) into their mother's bedroom and demand sex, saying, "You know what I want from you." Appellant also had sex with his stepdaughters in the basement, the kitchen, and the living room. Neither S.T. nor E.T. reported these incidents to anyone—even to each other—out of fear. Appellant told S.T. that he would kill her "and throw [her] dead body in the trash can" if she said anything to anyone. E.T. testified that appellant would say, "If you tell anyone, I am going to kill you." S.T. particularly heeded appellant's threats because she knew that he kept a gun under his mattress.[7] The last time appellant had sex with S.T. was in August of 1996, and with E.T. on September 12, 1996.

On September 13, 1996, appellant asked his three stepdaughters to clean the basement when they came home from school. During the conversation, and apparently in defiance of the request to clean the basement, S.T. walked away. Appellant chased her and slapped her, causing her face to bruise. Later that same day, S.T. went to the police and reported that appellant "had beaten her and had been having sex with her." After receiving this complaint, the police retrieved E.T. from her school and brought both girls to Children's Hospital for a physical examination.

D.T.'s mother, R.T., raised C.G. after adopting her when she was several months old from another family member. C.G. referred to R.T. as her mother[8] and to appellant, her aunt's husband, as "Tim" or "Timmy." When C.G. was six years old and in the first grade,[9] R.T. would regularly drop her off at appellant's house very early in the morning before going to work. Later in the morning,[10] C.G. would walk to school or be taken to school by appellant. Shortly after C.G. began to be dropped off at D.T.'s house, appellant started to have sexual intercourse with her. Appellant told C.G. that this activity was their secret and that she should not tell anyone about it, so C.G. refrained from reporting these incidents to any adult for fear that she

---

5. Because of the nature of the case, we shall refer to most of the family members by their initials.

6. At the time of trial, S.T. and E.T. were seventeen and fourteen years old, respectively. None of the charges against appellant involved Sh. T., the oldest of the three sisters.

7. Appellant not only threatened his stepdaughters, but also was violent with them. Once when S.T. told appellant that she did not want to have sex with him, appellant

struck her in the face, causing a nosebleed. When appellant finished helping S.T. clean up her face, he then had sex with her.

8. R.T. was actually C.G.'s great-aunt.

9. C.G. was ten years old when she testified at trial.

10. Sometimes C.G. would go to sleep at D.T.'s house because she arrived there an hour or more before the start of school.

would get herself in trouble.[11] She did, however, relate her encounters with appellant to her cousin W.T.,[12] who had previously told C.G. that appellant was also having sex with her. Later, after appellant was arrested, C.G. finally informed R.T. about the abuse, and R.T. took her to the police on September 22, 1996. C.G. was then taken to Children's Hospital for a physical examination.

Dr. Beverly Lindsay, a board-certified pediatrician at Children's Hospital, specializes in dealing with children who make allegations of sexual or physical abuse. After reviewing the medical records of both C.G. and E.T., Dr. Lindsay testified that in her expert opinion C.G. had been sexually abused on numerous occasions. In forming this opinion, the doctor relied specifically on several facts: that C.G.'s vaginal area was irritated and inflamed in a manner consistent with injury; that her hymen was perforated and irregular; that she tested positive for chlamydia; and that she disclosed to medical personnel that she had been molested. As to E.T., Dr. Lindsay testified that E.T.'s vaginal examination was positive for the presence of semen, and that E.T. had an irregular hymen and a rectal tear. Given these facts, Dr. Lindsay said she "would be concerned that [E.T.] was sexually abused by someone, that something was introduced into her vagina."

Agent Richard Guerrieri of the FBI Laboratory testified as an expert in the field of forensic DNA analysis. Agent Guerrieri examined the vaginal swabs and the semen samples taken from E.T.'s panties when she visited Children's Hospital. After analyzing the DNA in those samples, he concluded that appellant was "a potential source of what was found in the semen from the underwear," while ruling out approximately 99.66% of the applicable population as a potential source.

Testifying in his own defense, appellant denied having sex with any of the three girls. He stated that he and his stepdaughters had "a good family life" and that the members of the family always got along together. He admitted, however, that he had an argument with S.T. on September 13 (the day she went to the police) about the cleanliness of the basement. He said that S.T. was disrespectful of him, so he spanked her with his belt.

Appellant also testified that he had an affair with T.T., his wife's sister, during the summer of 1996.[13] He speculated that his stepdaughters and niece concocted the sexual abuse allegations at his wife's instigation when she learned of the affair with T.T. from her brother. Appellant said that he first heard of the allegations against him when he called his cousin, Officer John Savory of the Metropolitan Police.[14]

Stephanie Toney, a former co-worker of S.T. during the summer of 1996, testified that on one occasion during that summer

---

11. C.G. had sex with appellant several times in D.T.'s bedroom. On one such occasion C.G. asked appellant to put it in her "back part" (which she also called her "butt") because her "private part" or "front part" was "hurting."

12. W.T. was two years older than C.G.

13. In rebuttal, T.T. flatly denied ever having sex with appellant or any romantic relationship with him.

14. In rebuttal, Officer Savory testified that appellant called him on September 14, 1996, and asked him "if there was a warrant out for him, for raping some children." At that time Officer Savory was unaware of any warrant, and when he checked, he found that there was no outstanding warrant for appellant's arrest.

S.T. tried to persuade her to lie to authorities by saying that appellant had molested her. S.T. stated to Toney that "they probably won't believe me [if I report the sexual abuse]." Tiffany Reaves, appellant's nephew's girl friend, testified that during the summer of 1996, she saw C.G. having sex with a boy nicknamed "Juicy" at her house (*i.e.,* R.T.'s house) in Southeast Washington. In rebuttal, R.T. testified that at the time Reaves said she saw Juicy having sex with C.G., C.G. was not living at her house. Her testimony was meant to suggest that Reaves must have seen some other girl having sex with Juicy.

## II

Appellant contends that the victims' various statements to police officers and medical personnel that were admitted at trial under exceptions to the hearsay rule were not properly admissible as substantive evidence without limitation. We hold that all of the challenged statements were admissible under either the prior identification exception or the medical diagnosis exception to the hearsay rule.

■ Evidentiary rulings by a trial court are reviewed for abuse of discretion and will be reversed only if the court's exercise of discretion is clearly erroneous. *E.g., Pickett v. United States,* 822 A.2d 404, 405 (D.C.2003); *Malloy v. United States,* 797 A.2d 687, 690 (D.C.2002). Determining whether a statement falls within an exception to the hearsay rule, on the other hand, presents a question of law which this court considers *de novo. See Doret v. United States,* 765 A.2d 47, 62 (D.C.2000), *cert. denied,* 532 U.S. 1030, 121 S.Ct. 1980, 149 L.Ed.2d 772 (2001). In this case defense counsel failed to object

when E.T.'s statements to medical personnel were admitted into evidence, and also failed to request a limiting instruction about the statements made to medical personnel by both E.T. and C.G. We therefore review the trial court's rulings only for plain error. *See Hunter v. United States,* 606 A.2d 139, 144 (D.C.), *cert. denied,* 506 U.S. 991, 113 S.Ct. 509, 121 L.Ed.2d 444 (1992); *Williamson v. United States,* 445 A.2d 975, 980 n. 5 (D.C.1982). We find no plain error; indeed, we find no error at all.

### A. *The Prior Identification Exception*

■ The prior identification exception to the hearsay rule allows the admission of out-of-court statements through the testimony of either the identifier or a third party who was present when the identification was made. *Morris v. United States,* 398 A.2d 333, 336 (D.C.1978); *Clemons v. United States,* 133 U.S.App. D.C. 27, 39–40, 408 F.2d 1230, 1242–1243 (1968) (en banc). The prior identification exception originated in case law and is now also codified in D.C.Code § 14–102(b)(3) (2001).[15] *Mercer v. United States,* 724 A.2d 1176, 1195 (D.C.1999); *see Johnson v. United States,* 820 A.2d 551, 557–559 (D.C. 2003). Both the statute and the common law that preceded it make clear that prior statements of identification are substantive evidence. The rationale behind the hearsay exception is that "the earlier identification has greater probative value than an identification made in the courtroom after the suggestions of others and the circumstances of the trial may have intervened to create a fancied recognition in the witness' mind." *Morris,* 398 A.2d at 337 (citation omitted); *see Clemons,* 133 U.S.App. D.C.

---

15. D.C.Code § 14–102(b)(3) provides in part:
 A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is ... an identification of a person made after perceiving the person. Such prior statements are substantive evidence.

at 40, 408 F.2d at 1243 ("a courtroom identification ... standing alone, often means very little to a conscientious and intelligent juror, who routinely expects the witnesses to identify the defendant in court").

 There are, however, two restrictions on the use of this exception. First, the identifying witness must be available for cross-examination. *Yelverton v. United States,* 606 A.2d 181, 184 (D.C.1992). Second, the exception applies to statements of identification, but not to detailed accounts of the actual crime; the declarant's "description of the offense itself is admissible under this exception only to the extent necessary to make the identification understandable to the jury." *Porter v. Unied States,* 826 A.2d 398, 410 (D.C.2003) (citations omitted); *see also Johnson v. United States,* 820 A.2d 551, 559 n. 4 (D.C. 2003) ("an identification must have context"); *Battle v. United States,* 630 A.2d 211, 215 (D.C.1993); *Sherrod v. United States,* 478 A.2d 644, 660 (D.C.1984).

 In this case, three of the challenged statements by the victims to police officers and to medical personnel clearly fit within the prior identification exception to the hearsay rule. First, appellant contends that the court should not have allowed Detective Lisa Adams to testify that C.G. told her during an interview at police headquarters on September 22, 1996, that "she was assaulted by [appellant]." The trial court, citing *Battle,* admitted this statement for the purpose of showing that a report of a sexual assault was made.[16] Because C.G. was available for cross-examination, the statement was also admissible

as substantive evidence under the prior identification exception. *See, e.g., Williams v. United States,* 756 A.2d 380, 386–387 (D.C.2000) (victim's statements identifying defendant as the person who sexually abused her, but including no details of the sexual incidents, were admissible under *Morris*).

Second, appellant challenges Officer Sabrina Young's testimony that S.T. "came into the [police] station with teary eyes" on September 13, 1996, and said to Officer Young that she was "tired of [her] stepfather" and that he "had beaten her and had been having sex with her." The trial court correctly ruled that the officer could provide a summary of S.T.'s statements, but not any unnecessary details. *See Porter,* 826 A.2d at 410; *Battle,* 630 A.2d at 215; *Sherrod,* 478 A.2d at 660. Again, because S.T. was available for cross-examination, her statement to Officer Young was admissible as substantive evidence. *Williams,* 756 A.2d at 386–387.

 Third, appellant objects to Dr. Lindsay's testimony that the medical records indicated that medical personnel were told by C.G. on September 22, 1996, that "Tim" had "sexually abused her ... [that she] was molested at his home after school, and [that] it happened a lot of times." These statements were also properly admitted under the prior identification exception because no details of the incidents themselves were divulged. Once again, because C.G. was available to be cross-examined, the statements were admissible as substantive evidence. *Williams,* 756 A.2d at 386–387.

---

16. We agree that this statement was admissible under the report of rape exception to the hearsay rule, discussed at some length in *Battle,* for the limited purpose of demonstrating that a report was made. However, because we are satisfied that this statement was more broadly admissible without limitation as substantive evidence under the prior identification exception of *Morris* and *Clemons,* we need not base our decision on the more narrow report of rape exception.

Fourth, appellant challenges the admission of Dr. Lindsay's testimony concerning E.T.'s statements to medical personnel on September 13, 1996:

> She says that she had intercourse with her stepfather yesterday, which would be 9–12–96. She also says she had rectal intercourse. She denies oral sex. She states she has had sexual intercourse two to three times per week in the basement and in the living room ... [and that] the first incident of sexual abuse or sexual activity occurred when she was about five years old.[17]

These statements are a bit harder to admit under the prior identification exception than the previous statements because they reveal details about the actual crimes, and we cannot be certain from the record that the trial judge regarded those details as necessary to the jury's understanding of the identifications. *See Porter*, 826 A.2d at 410. We need not decide whether they should have been admitted as prior identification evidence, however, because they were admissible under another well-recognized exception.

**B. *The Medical Diagnosis Exception***

 The statements incorporated in Dr. Lindsay's testimony about C.G. and E.T. were admissible under the medical diagnosis exception to the hearsay rule. Under this exception, "statements made by a patient for purposes of obtaining medical treatment are admissible for their truth because the law is willing to assume that a declarant seeking medical help will speak truthfully to medical personnel." *Jones v. United States*, 813 A.2d 220, 226 (D.C.2002) (quoting *Galindo v. United States*, 630 A.2d 202, 210 (D.C.1993)). Similarly, statements in a victim's hospital

records explaining the cause of an injury also fall within the exception "because explaining the cause of injuries may facilitate treatment." *Galindo*, 630 A.2d at 210; *see Jones*, 813 A.2d at 227. Appellant correctly points out that statements of fault are generally excluded from the medical diagnosis exception. However, if the statement involves a child who has been sexually assaulted by a member of her household, it may be admissible because the injury being treated is no longer just physical but psychological and emotional as well. *See Galindo*, 630 A.2d at 210. Furthermore, such statements are relevant to treatment in preventing "a reoccurrence of the abuse." *Id.*

The statements to medical personnel in the instant case fall within the holding of *Galindo*. Appellant was the stepfather of two of the victims and an uncle by marriage of the third. E.T. lived with appellant in his immediate household, while C.G. regularly spent part of each morning at the house and knew appellant as her uncle. Identifying him as the person who sexually abused them was thus pertinent to medical treatment and important in preventing their injuries from reoccurring. We hold accordingly that, even without reference to the prior identification exception, these statements about which Dr. Lindsay testified were admissible under *Galindo* and the medical diagnosis exception.

### III

Appellant contends that the trial court erred in limiting cross-examination of C.G. (1) about her prior sexual activity and (2) about her knowledge of accusations made by her older cousin, W.T., of sexual assault against W.T.'s mother's boy friend. Ap-

---

17. Appellant did not object to the admission of these statements as evidence identifying him as her assailant.

pellant argues that both of these lines of inquiry were relevant and that the evidence he sought to present was "constitutionally required to be admitted."

When defense counsel attempted to cross-examine C.G. about her sexual activity with her cousin Dionte, the government objected. Counsel then proffered that the two children were caught having sex at some point between 1994 and 1996; the government argued in response that the questions should not be allowed because they would elicit evidence of past sexual conduct by the victim. Defense counsel replied that the evidence of prior sexual conduct would explain some of the observations in C.G.'s medical records. The court sustained the government's objection, but added that if defense counsel made a more detailed proffer, "there may be a basis to permit [the defense] to challenge some medical evidence."

Defense counsel also attempted to cross-examine C.G. about her knowledge concerning claims of sexual assault made by her older cousin, W.T., against appellant and another man. Counsel sought "to demonstrate how the environment in which the subject accusations arose would have tended to explain how such a young child could have known such things, and why her accusations could have been inspired by an urge to emulate an admired elder." The government objected to this line of questioning as collateral, irrelevant, and prejudicial. The court ruled that defense counsel would be allowed to question C.G. about her knowledge of the accusations that W.T. made against appellant, but not about the accusations leveled at the other man. The court reasoned that it was "relevant, if someone else planted the seed

that this person does this to little girls … the jury is entitled to hear that." [18]

 "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *see Springer v. United States*, 388 A.2d 846, 857 (D.C.1978). If the trial court has permitted "enough cross-examination on an appropriate issue to satisfy the Sixth Amendment," any limitation on further cross-examination will be reviewed on appeal only for abuse of discretion. *Stack v. United States*, 519 A.2d 147, 151 (D.C. 1986). "Implicit in this standard is an evaluation of the importance of the subject matter and the witness … measured against the degree of cross-examination permitted." *Id.*

Appellant contends that the evidence concerning C.G.'s alleged prior sexual activity with Dionte was not barred by the District of Columbia's rape shield law and should have been admitted because it was offered as an explanation for the government's medical evidence and thus went to the core of the defense. Under the rape shield law, D.C.Code § 22–3022 (2001), the admission of evidence of a victim's past sexual behavior is limited to three specific situations: (1) when the evidence "is constitutionally required to be admitted"; (2) when the evidence is "offered by the accused upon the issue of whether the accused was or was not, with respect to the alleged victim, the source of semen

18. The court went on to say that it "is reasonable for [defense counsel] to want to probe whether or not this witness has been influenced to make up this story because of something else that she has heard, and it seems to me that that is fairly limited to someone else saying that Timmy did this to them."

or bodily injury"; or (3) when the evidence concerns "[p]ast sexual behavior with the accused where consent of the alleged victim is at issue and is offered by the accused upon the issue of whether the alleged victim consented to the sexual behavior with respect to which such offense is alleged." D.C.Code § 22–3022(a).

The statute prescribes a procedure that a defendant must follow before offering evidence of specific instances of a victim's past sexual behavior. First, the defendant must file a written motion at least fifteen days prior to the trial date. D.C.Code § 22–3022(b)(1).[19] Any such motion must be filed under seal and must be served on all parties, including the alleged victim; in addition, a written offer of proof must be made to the court, and if that offer of proof contains evidence of specific instances of past sexual behavior, the court must conduct an *in camera* hearing. D.C.Code § 22–3022(b)(1)-(2). If the court determines from the hearing that the probative value of the evidence outweighs the danger of unfair prejudice, only then may the evidence be admitted at trial. D.C.Code § 22–3022(b)(3).

Because the charges relating to C.G. were added by a superseding indictment less than a month before trial,[20] the court waived the time limits set by the rape shield statute and allowed the defense to present evidence of C.G.'s past sexual behavior with the boy known as Juicy, but only after receiving a detailed offer of proof and holding an *in camera* hearing. The court acted similarly when defense counsel attempted to question C.G. about her alleged sexual activity with Dionte. The court was unwilling to allow this evidence to come in during the cross-examination of C.G., but it did say that if counsel made a detailed proffer, evidence of this sort could be used to refute the medical testimony. In so ruling, the court also apparently waived the procedural requirements outlined in the statute and instead only asked defense counsel to make a detailed proffer so that it could determine whether an *in camera* hearing was necessary. Counsel, however, failed to follow up with a detailed proffer, and thus the evidence about Dionte was never heard by the jury.

With rare exceptions, evidence of prior sexual activity by the victim with persons other than the defendant is not admissible in a rape case because it has no probative value on the issue of consent and no relevance to the victim's credibility. *McLean v. United States*, 377 A.2d 74, 77–78 (D.C.1977). Thus a defendant is generally prohibited from asking the victim of sexual abuse "about her sexual relations with others" and from attempting "to impeach her credibility by examining other witnesses concerning their knowledge of specific instances in which [she] engaged in sexual intercourse in the past." *Id.* at 78. Evidence of prior sexual activity by the victim in a sexual abuse case "should not be admitted except in the most unusual cases where the probative value [of the evidence] is precisely demonstrated." *Id.* at 79; *see Hagins v. United States*, 639 A.2d 612, 615–616 (D.C.1994) (reiterating that evidence of prior sexual conduct is admitted only in unusual circumstances); *see also, e.g., Brewer v. United States*, 559 A.2d 317, 320 (D.C.1989) (upholding the exclusion of evidence that rape victim had

---

**19.** The motion can be filed later, however, if the evidence is newly discovered and could not have been obtained earlier through the exercise of due diligence, or if the issue has newly arisen in the case. D.C.Code § 22–3022(b)(1).

**20.** The charges in the original indictment involved only S.T. and E.T.

engaged in acts of prostitution when there was no showing that she consented to sexual intercourse with the defendant), *cert. denied*, 493 U.S. 1092, 110 S.Ct. 1163, 107 L.Ed.2d 1066 (1990); *Meaders v. United States*, 519 A.2d 1248, 1254 (D.C.1986) ("[p]rejudice results when cross-examination probes into the private life of a rape victim").

■ In the case at bar, defense counsel was able to make a precise demonstration of the probative value of evidence concerning sexual activity between C.G. and Juicy because counsel had an eyewitness (even though that witness' testimony was later rebutted). By contrast, there was no eyewitness or other direct evidence offered to the court concerning the alleged sexual activity between C.G. and Dionte, nor was there any relevant circumstantial evidence. Defense counsel could only proffer that she had "evidence that she and ... Dionte were caught in the basement at least fooling around, if not having sex at one point. My evidence is they were having sex." Counsel failed to proffer any evidence suggesting that this information was credible, nor did she explain how C.G.'s alleged sexual activity with Dionte would undercut the medical testimony. On this record we hold that the court properly barred a highly prejudicial line of questioning until such evidence was provided—which never happened.[21]

■ Finally, appellant contends that the trial court violated his Sixth Amendment right of confrontation by preventing cross-examination of C.G. about her knowledge of W.T.'s claims of sexual assault against a third party. Defense counsel was attempting to show that accusations of sexual assault were "tossed around" in the environment in which C.G. was raised and that C.G. was attempting to emulate her cousins by making similar accusations. We interpret this argument as raising issues of bias and motivation, and note that "the exposure of a witness's motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Van Arsdall*, 475 U.S. at 678–679, 106 S.Ct. 1431 (citation omitted). Nevertheless, even when a defendant is attempting to impeach an accuser with evidence of bias, the trial court may impose "reasonable limits on such cross-examination based on concerns about ... confusion of the issues ... or interrogation that is repetitive or only marginally relevant." *Id.* at 679, 106 S.Ct. 1431. That, in our view, is what happened here. The court properly restricted the cross-examination of C.G. on this subject because knowledge of a sexual assault involving a third party was collateral to the case being tried and would only serve to confuse and distract the jury from the actual issues in the case. *See Gibson v. United States*, 536 A.2d 78, 82 (D.C.1987) ("[t]here is no constitutional right to present irrelevant evidence"). Moreover, despite the limitation placed on defense counsel's ability to cross-examine C.G. about W.T.'s claims against a third party, counsel was still able to advance the defense theory because she was able to cross-examine C.G. at length about her knowledge of the sexual abuse accusations made by S.T., E.T., and W.T. against appellant.

For these reasons we find no basis for reversal in the court's restrictions on defense counsel's cross-examination of C.G.

---

**21.** Defense counsel knew what was required for the court to allow the evidence of activity between C.G. and Dionte because the court had previously ruled on the evidence of sexual activity between C.G. and Juicy. Since counsel apparently decided not to pursue the matter any further, appellant cannot now complain.

## IV

Relying on *Drew v. United States*, 118 U.S.App. D.C. 11, 16, 331 F.2d 85, 90 (1964), and its countless progeny, appellant maintains that the trial court erred in admitting evidence that he beat S.T. and that he had anal intercourse with E.T. because these acts constituted uncharged criminal activity. He also argues that the court erred by failing to give a limiting instruction about this "other crimes" evidence. We hold that the court did not err in admitting the evidence, and thus we need not even consider whether a limiting instruction was required, especially when none was requested.

■■■ Appellant challenges the testimony of Officer Young that S.T. reported that appellant "had beaten her and had been having sex with her." At trial, defense counsel objected to this evidence only on hearsay grounds, but not as evidence of other crimes inadmissible under *Drew*. He must therefore demonstrate plain error, *i.e.*, error "so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial." *Watts v. United States*, 362 A.2d 706, 709 (D.C.1976) (en banc) (citations omitted). We discern no error at all, and certainly no plain error.

■■■ Under *Drew*, evidence of another crime cannot be introduced to prove disposition of the defendant to commit the crime charged. However, in *Johnson v. United States*, 683 A.2d 1087, 1090 (D.C.1996) (en banc), *cert. denied*, 520 U.S. 1148, 117 S.Ct. 1323, 137 L.Ed.2d 484 (1997), this court held that, notwithstanding *Drew*, "the inadmissibility of . . . evidence of other crimes may be overcome if it is offered on and determined to be relevant to a material issue in the case." The *Johnson* court also "reaffirm[ed] that the *Drew* rule . . . does not apply to evidence of acts, including criminal conduct, that directly prove[ ] the crime charged." *Id.*; *see Toliver v. United States*, 468 A.2d 958, 961 (D.C.1983). Following prior case law, including *Drew* itself, we reiterated that *Drew* does not apply when the challenged evidence "(1) is direct and substantial proof of the charged crime, (2) is closely intertwined with the evidence of the charged crime, or (3) is necessary to place the charged crime in an understandable context." *Johnson*, 683 A.2d at 1098; *see also Williams v. United States*, 549 A.2d 328, 332 (D.C.1988) (listing five principal exceptions to the *Drew* rule recognized in *Drew* itself, and noting that there are additional exceptions).

■■■ In the present case, S.T.'s statement that she had been beaten by appellant was "closely intertwined" with the report of sexual abuse. The beating mentioned at trial was the immediate cause of her finally deciding to go to the police on September 13 to report the sexual assaults, and thus it was directly connected with the charged crime. For years she had been subjected to sexual assaults, accompanied by threats that, if she told anyone about them, appellant would kill her or her mother. On September 13, however, the abuse reached such a critical point that it forced S.T. to seek help despite appellant's threats. We hold that the challenged evidence served to place the charged crimes in context, *see Bell v. United States*, 677 A.2d 1044, 1047–1048 (D.C.1996), because it aided the jury in understanding what finally prompted S.T. to come forward with her serious allegations—she had nothing to lose, and she was being physically abused regardless of whether she told anyone about the sexual assaults—and made clear that she was justified in believing appellant's threats of physical harm if she were to come forward. In addition, the physical abuse was directly tied to the

sexual abuse and, to that extent, constituted direct evidence of the charged crimes.

■ Appellant also claims error in the admission of Dr. Lindsay's testimony regarding "a fissure, a tear present" during E.T.'s rectal exam. Defense counsel objected to this evidence, calling it "uncharged" and "prejudicial." The prosecutor agreed to move on to a new line of questioning and suggested that the court instruct the jury to disregard the evidence. Defense counsel objected to the instruction, however, apparently not wishing to draw any further attention to the doctor's statement. The court sustained the objection, but never actually struck the statement from the record.

The record of the medical examination in which it was determined that E.T. had a rectal tear was directly linked to E.T.'s testimony that appellant had engaged in anal sex with her over an extended period of time, and in particular on the day before she was examined. Here again, the challenged evidence not only was "direct and substantial proof of the charged crime," but also was "closely intertwined with the evidence of the charged crime." *Johnson,* 683 A.2d at 1098. Thus, notwithstanding defense counsel's objection, it was indisputably admissible, and the court committed no error in failing to tell the jury to disregard it.

Finally, appellant contends that the court should at least have given limiting instructions with respect to the "other crimes" evidence. Since that evidence was admissible without limitation, however, no such instruction was required. *See Busey*

*v. United States,* 747 A.2d 1153, 1166–1167 (D.C.2000); *Bell,* 677 A.2d at 1048.

## V

■ At trial, defense counsel asked the court to give the standard "red book" instruction on the testimony of a child,[22] but that request was denied. Instead, the court gave a more general instruction that incorporated the pertinent ideas contained in the special instruction for child witnesses:

In reaching a conclusion as to the credibility of any witness you may consider any matter that may have a bearing on the subject. You may consider the demeanor and the behavior of the witness on the witness stand, the witness' manner of testifying, the age of the witness and the capacity of the witness to distinguish truth from falsehood, whether the witness impresses you as a truthful person, whether the witness impresses you as having an accurate memory and recollection, whether the witness has any motive for not telling the truth, whether the witness had a full opportunity to observe the matters about which he or she has testified, whether the witness has any interest in the outcome of the case, or friendship or hostility toward other people concerned with this case.

Appellant now contends that the court abused its discretion by failing to give the specific instruction that he requested.

■ In *Hicks v. United States,* 658 A.2d 200 (D.C.1995), this court voiced agreement with the "prevailing view ... that a trial judge retains discretion to determine whether the jury should receive a

---

**22.** CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 2.21 (4th ed. 1996). In addition to general comments about credibility, this instruction directs the jury to "consider the capacity of a child witness to distinguish truth from falsehood and to appreciate the seriousness of his/her testimony" and includes optional language that "children may be more suggestible than adults."

special instruction with respect to the credibility of a young witness, and, if so, the nature of that instruction." *Id.* at 202 (citations and internal punctuation omitted). We observed further that, absent unusual circumstances, "a general credibility instruction is ordinarily sufficient." *Id.* (citation omitted). Appellant argues that this case presented unusual circumstances because the incidents in question involved three juvenile witnesses who were testifying about events that occurred three to seven years earlier.[23] The proper focus, however, is on the competence of the witnesses while testifying at trial, not their age at the time of the events. *See Smith v. United States,* 414 A.2d 1189, 1197–1198 (D.C.1980) (eight-year-old girl found competent to testify about a murder that occurred when she was three and a half); *cf. Robinson v. United States,* 642 A.2d 1306, 1310–1311 (D.C.1994) (upholding refusal to admit evidence of excessive drinking by government witness six years before the date of the crime). The trial court, therefore, correctly found no unusual circum-

stances warranting a special jury instruction: "I didn't see a basis to give me cause for concern in terms of competency or ability to relate information." A trial judge has discretion to determine how to instruct a jury about a child witness because the judge has heard all the evidence and thus is best equipped to decide what specific guidance may or may not be needed to aid the jury in properly weighing the testimony. On this record we find no abuse of that discretion.

### VI

There being no basis for reversal, appellant's convictions are all

*Affirmed.*

---

**23.** At trial, defense counsel argued that a special instruction was necessary only for C.G.'s testimony. However, counsel believed that if the instruction were given specifically with respect to C.G. and no other witness, the jury might conclude that the court was endorsing the testimony of the other two juvenile witnesses. Counsel therefore sought the instruction for all three witnesses.