**Marcellus TAYLOR, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 99–CF–1379.

District of Columbia Court of Appeals.

Argued Jan. 6, 2005.
Decided Jan. 27, 2005.

Erin Murphy, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Suzanne Grealy Curt, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, and Thomas J. Tourish, Jr., Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY, FARRELL and REID, Associate Judges.

REID, Associate Judge:

Appellant Marcellus Taylor was indicted on a charge of first-degree premeditated murder while armed, in violation of D.C.Code §§ 22–2401, –3202 (1996),[1] but was convicted of the lesser-included charge of second-degree murder while armed, and two weapons offenses. He contends on appeal that the trial court erred in (1) in admitting prior consistent statements and other testimony from government witnesses, (2) giving the jury a "reasonable efforts" instruction over his objection, despite his initial selection of an "acquittal first" instruction, and (3) reminding the jury that the District of Columbia does not have a death penalty. We affirm the trial court's judgment of conviction.

## FACTUAL SUMMARY

The government presented evidence showing that sometime in June 1997, Phillip Richardson pistol-whipped Mr. Taylor because he suspected that Mr. Taylor had stolen his marijuana and gun. During the pistol-whipping, the gun discharged but no one was hit by the bullet. Efforts on the part of others to settle the differences between Mr. Richardson and Mr. Taylor failed and tensions between the two men increased.

Several weeks after the pistol-whipping incident, on the evening of July 31, 1997, Mr. Richardson, Bernard Adolphus (who also was known as "Killer"), and Thaddeus Mason were engaged in selling drugs on Second Street in the Southeast quadrant of the District of Columbia. Mr. Richard-

---

1. Recodified at D.C.Code § 22–2101 (2001).

son and Mr. Adolphus were stationed at Wayne Place and Second Street, while Mr. Mason was positioned several blocks away at Wilmington and Second Streets. Mr. Mason's role was to direct potential buyers to Mr. Richardson and Mr. Adolphus. When Mr. Richardson suspected that Mr. Mason might be cheating on him by not directing potential buyers to him, Mr. Richardson walked to Wilmington and Second Streets to complain that he was not receiving potential buyers. He proceeded to direct the drug traffic, and to sell marijuana while sitting on the curb with Felicia Johnson, a resident of the neighborhood, who often obtained drugs from Messers. Richardson, Mason or Adolphus.

Although Ms. Johnson admitted that she had taken cocaine during the day on July 31, 1997, she claimed that she was not high in the evening, but she admitted that she had spoken with Mr. Richardson "to get some money [to] get [drugs]." She testified that approximately thirty minutes before Mr. Richardson was fatally shot, she saw Mr. Taylor exit a red Ford Escort, and proceed into a building with a pistol in hand. Later, she sat outside with Mr. Richardson; Mr. Mason also was present, sitting in front of his residence. Soon she saw a red Ford Escort slowly approaching. The streetlight was on and Ms. Johnson could see Mr. Taylor behind the wheel. Mr. Richardson got up, crossed the street, and the car pulled up to him. Ms. Johnson observed Mr. Richardson's face. He looked as though "he was going to die or something." Ms. Johnson saw and heard gunfire coming from the driver's side of the red Ford Escort, and the passenger in the car, whom she did not recognize, also appeared to be firing shots while leaning over the driver. After about five or six shots, Mr. Richardson began to run. Ms. Johnson thought more than one firearm was in use—a revolver and an automatic gun. Ms. Johnson got down on the ground, looked back and saw gunfire, and then crawled away to the side of a building. She went to a friend's house "for a couple of minutes," but left there when she heard the sound of an ambulance. She went to her home where she saw her mother, Gwendolyn Johnson, and Linda Sellers standing out front. That same evening, she talked with Mr. Adolphus and Ms. Sellers about what had happened.

The next day, Felicia Johnson was questioned by the police. She gave a false name "because [she] did not want to get involved and be labeled as a snitch and [she] was scared. . . . for [her] life," even though she did not receive any such threats.[2] After the police discovered Ms. Johnson's real name, Ms. Sellers took her to the police station. Ms. Johnson told the police what she had seen on July 31, 1997. The police took her statement which she signed. Although Ms. Sellers was at the police station when Ms. Johnson gave her statement, the women were not in the same room. In response to a question from the prosecutor, Ms. Johnson stated that Ms. Sellers told her, after she gave her statement but before she signed it, that she would give her some money. Government counsel asked Ms. Johnson whether her statement "change[d] at any point." She replied, "no it did not." Defense counsel objected "on hearsay grounds as a prior consistent statement." Ms. Johnson later spoke with Assistant United States Attorney Patrick Rowan and told him what she had seen, but when an investigator for the Public Defender Service ("PDS") interviewed her, she declared

2. The trial judge immediately instructed the jury that the questions posed were directed at Ms. Johnson's "motive in saying what she did to the police" rather than "reflecting anything [Mr. Taylor] might have done."

that she did not know Mr. Taylor, had seen nothing, and was "high all day, all night." She explained that she lied to the PDS investigator because she "didn't want to testify ... [and] [b]ecause [she] was scared for [her] life." Ms. Johnson revealed that she had testified in an earlier proceeding in Mr. Taylor's case and claimed that part of the testimony she had given was true and part was not. She asserted that she was "confused" and "scared." And in response to the government's question as to whether she still was on drugs, she insisted that she was not and in fact had not taken any within the past six months. The trial judge again instructed the jury that Ms. Johnson's assertions as to why she earlier told lies was addressed to her "motive" and not to what Mr. Taylor did.

Mr. Mason also witnessed the red Ford Escort as it drove into the area. He saw the profile of the driver who was wearing a brown "jungle" hat with a brim and a string. He identified the driver as Mr. Taylor, but could not identify the person in the passenger seat. Contrary to Ms. Johnson's account, Mr. Mason stated that the gunfire came from the passenger window. After he was shot, Mr. Richardson ran down the street. The red Ford Escort followed him and Mr. Mason heard more shots. He watched as Mr. Richardson fell down, and Mr. Adolphus ran up the street from his location, shooting at the red Ford Escort.

Mr. Adolphus testified that he heard gunshots, saw Mr. Richardson run down the hill followed by the red Ford Escort, and more gunshots were fired from the vehicle. He maintained that he saw Mr. Taylor in the driver's seat when the car drove by him. Mr. Adolphus was "a few feet" from the car at the time. He ran to the home of Gwendolyn Johnson and asked her to call the police. Another neighbor,

Linda Sellers, who had witnessed the June 1997 pistol-whipping of Mr. Taylor by Mr. Richardson and had tried to get the two men to reconcile their differences, saw Mr. Richardson on the ground following the shooting. Mr. Mason, Ms. Felicia Johnson, and Mr. Adolphus were on the scene. Mr. Adolphus took money from Mr. Richardson's pocket. At the sound of an ambulance, Mr. Adolphus, Mr. Mason and Ms. Johnson fled the scene.

Mia Lawrence, who admitted that she smoked marijuana, testified that she saw Mr. Taylor twice after he was pistol-whipped by Mr. Richardson; the first time, Mr. Taylor had a revolver, and the second time an automatic weapon.

Two to three weeks after the fatal shooting of Mr. Richardson, the police took Ms. Sellers to the police station. She was paid $100, which she later shared with Felicia Johnson. The police recovered cartridge casings from the scene of the shooting. The casings came from a .9mm automatic gun. Of the three bullets extracted from Mr. Richardson's body, two were made of lead and probably came from a revolver. After Mr. Taylor's arrest on August 10, 1997, keys to his apartment were found on his person and the police obtained a warrant to search his apartment. There they found keys for a Ford Escort belonging to Mr. Taylor's mother.

Ms. Johnson was subjected to extensive and rigorous cross-examination and re-cross-examination twice by defense counsel regarding her prior and conflicting testimony in this case, her use of drugs on the day of Mr. Richardson's murder and at other times, the details concerning the shooting of Mr. Richardson, the occasions on which the police questioned her, the money given to her by Linda Sellers, the bench warrant for her arrest in a pending welfare fraud case and the action of an Assistant United States Attorney in taking

her to the assigned judge in that case and informing the judge that she was "helping the government out" in one of the prosecutor's cases. The cross-examination of Mr. Mason was vigorous and covered such areas as his drug activities on the day of Mr. Richardson's murder, details as to what Mr. Mason saw on the day of the murder, his prior testimony in proceedings pertaining to Mr. Taylor, "the deal that [his] lawyer made with the U.S. Attorney's office" and the details of the plea agreement, and other cases relating to him that were "dismissed or no papered" but which were not part of the plea agreement.

The prosecution also presented the testimony of Assistant United States Attorney Patrick Rowan, Metropolitan Police Department ("MPD") Detectives Scott Gutherie and Robert Alder, and Officer Sean K. Dennis. Mr. Rowan responded to questions about Mr. Mason's plea agreement covering five cases and the dismissal or no papering of other cases,[3] Ms. Johnson's bench warrant relating to her failure to appear for a probation hearing in another case,[4] and the pending case of another government witness, Mia Lawrence.[5] Detective Scott Gutherie testified that Felicia Johnson identified Mr. Taylor as the shooter, described Ms. Johnson's demeanor during his interview with her, and indicated that he took a signed and sworn statement from her. Detective Robert Alder testified that both Felicia Johnson and Mr. Mason identified Mr. Taylor as the shooter. And Officer Sean Dennis described the steps he took in investigating Mr. Richardson's murder, including his interview with Linda Sellers from whom he got the names of two eyewitnesses, and Mr. Mason's identification of Mr. Taylor as the shooter. During his response to a question from one of the jurors, Officer Dennis stated that he called other detectives in while interviewing Mr. Mason

---

3. Four of the cases concerned misdemeanor marijuana distribution or possession charges, one of which also included weapons charges. In a fifth case, Mr. Mason had already entered a plea but had not been sentenced. Mr. Rowan testified that before he became involved in the case, the plea offer to Mr. Mason would have required a plea to three charges, with a possibility that one of the three would be dropped for technical reasons. After he was assigned to the investigation, the agreement would have required a guilty plea to one of the charges. Over the "prior consistent statement" objection of the defense counsel, which was overruled by the trial court, Mr. Rowan was asked whether Mr. Mason's "testimony change[d] in any way after [the] plea agreement was signed." He responded, "not to my recollection, . . ." but added that at that point he had not been presented to the grand jury. Mr. Rowan acknowledged that other potential cases against Mr. Mason had not been papered and thus he was not charged. Mr. Rowan did not learn about these cases until "after the fact." On cross-examination, Mr. Rowan was asked about his characterization of the agreement with Mr. Mason. He stated that he had written that Mr. Mason received "a good deal." Although Mr. Mason could have been subjected to enhancement papers with respect to the original charges filed against him, with a possible sentence of up to twelve years, he was not. Defense counsel asked Mr. Rowan: "[Is it] fair to say that you also documented previously that you had to give him a deal on his cases in order to obtain his complete cooperation . . . ?" He responded, "Yes, . . . [Mr. Mason and his attorney] clearly indicated that they wanted some concession in exchange for his cooperating."

4. After a police detective had informed Ms. Johnson of the outstanding bench warrant against her, Mr. Rowan took her to court, informed the judge that "she's a witness on a case of [his]," and "explain[ed] that [he] had no problems with her." Mr. Rowan denied having any "deal" with Ms. Johnson "in exchange for her truthful testimony."

5. Mr. Rowan denied taking any steps to get the charge against Ms. Lawrence dismissed, or having entered into any "deal" with Ms. Lawrence to obtain her testimony in Mr. Taylor's case.

when he "realized that he was possibly a credible witness."

## ANALYSIS

### Prior Consistent Statements and the Testimony of Law Enforcement Officers

■ Mr. Taylor complains that "the trial court permitted the government to introduce evidence—much of it through police officers and a prosecutor who carried the authority of their office—intended to vouch for the integrity of the investigation generally and to attest to the ultimate 'truth' of the witness' in-court testimony." Specifically, Mr. Taylor contends that the government's case turned on the credibility of Ms. Johnson, who used cocaine, and Mr. Mason, a drug seller who "had five open cases at the time of [Mr. Taylor's] trial, one of which was pending sentence." Mr. Taylor asserts that to strengthen the testimony of these witnesses, the government not only improperly allowed them to testify as to their prior statements, but also used the testimony of MPD Detectives Gutherie and Robert Alder, and Officer Dennis, as well as the testimony of Assistant United States Attorney Patrick Rowan to " 'artificially strengthen[ ] a marginal case.' "

The government argues that the trial court properly admitted the testimony of its witnesses as substantive evidence under D.C.Code § 14–102(b) (2001), did not abuse its discretion in allowing Ms. Johnson and Mr. Mason to relate certain of their prior consistent statements as prior identification testimony or to rebut impeachment evidence, and the Assistant United States Attorney and police detectives and officer to explain cooperation and plea agreements with the witnesses, as well as the course of their investigation into Mr. Richardson's murder. The government contends that even assuming error on the part of the trial court, the error

was harmless since its "case was compelling."

■ "Evidentiary rulings by a trial court are reviewed for abuse of discretion and will be reversed only if the court's exercise of discretion is clearly erroneous." *Brown v. United States*, 840 A.2d 82, 88 (D.C.2004) (citations omitted). However, we consider a question concerning the application of an exception to the hearsay rule *de novo*. *Id.* Generally, prior consistent statements of a witness are inadmissible and their "exclusion ... is intended to avoid the prejudice of unfairly bolstering the witness' credibility." *Porter v. United States*, 826 A.2d 398, 410 (D.C.2003) (citing *Daye v. United States*, 733 A.2d 321, 327 (D.C.1999)). "The prior identification exception to the [general] rule[...]allows the admission of out-of-court statements through the testimony of either the identifier or a third party who was present when the identification was made." *Brown, supra*, 840 A.2d at 88 (citations omitted); *see also* D.C.Code § 14–102(b)(3) (2001) ("A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is ... an identification of a person made after perceiving the person. Such prior statements are substantive evidence."). The prior identification "exception applies to statements of identification, but not to detailed accounts of the actual crime; the declarant's 'description of the offense itself is admissible under this exception only to the extent necessary to make the identification understandable to the jury.' " *Brown, supra*, 840 A.2d at 89 (quoting *Porter, supra*, 826 A.2d at 410). Furthermore, we have also said that:

> [P]rior consistent statements may still be admitted to rehabilitate a witness in at least two "exceptional situations," namely, "(1) where the witness has been

impeached with a portion of a statement and the rest of the statement contains relevant information that could be used to meet the force of the impeachment, and (2) where there is a charge of recent fabrication."

*Jacobs v. United States*, 861 A.2d 15, 18–19 (D.C.2004) (citation omitted).

Here, the trial court determined that "prior description testimony [was] admissible under the identification theory." The record before us reveals that the trial court was careful in its application of the prior identification exception, and limited what the government could elicit from its witnesses with respect to that exception. On this record, we see no abuse of discretion with respect to the prior identification testimony of Felicia Johnson, Mr. Mason, Detectives Gutherie and Alder, and Officer Dennis.

 Mr. Taylor also contends that the trial court improperly permitted the government to introduce testimony through Detectives Gutherie and Alder, Officer Dennis and Assistant United States Attorney Rowan that "vouched" for the government's evidence or the credibility of Felicia Johnson and Mr. Mason, and hence "artificially strengthened a marginal case." The record reflects that the trial court allowed these witnesses to provide testimony regarding the course of the investigation, including the government's plea agreement with Mr. Mason and its interaction with Felicia Johnson. And it also allowed jurors to pose questions to Mr. Rowan regarding his view of certain actions by the police detectives, such as the payment of money to Ms. Sellers which she shared with Ms. Johnson. The trial court concluded that prior consistent statements could not come in to rehabilitate the government's witnesses on the ground that there was a charge of recent fabrication, but could come in to rehabilitate a witness where a "witness's testimony ha[d] been impeached by a portion of a statement containing relevant information that could be used to meet the force of the impeachment." The record shows that the trial judge both sustained and overruled defense counsel's objections to the prosecutor's lines of questioning with respect to the testimony of the police detectives and officer, and the Assistant United States Attorney. Much of the challenged testimony was designed to rehabilitate the government's witnesses, especially Felicia Johnson and Mr. Mason, who had been subjected to rigorous and vigorous cross-examination, and in the case of Ms. Johnson re-cross-examination twice. In short, the trial court allowed this testimony to "meet the force of the impeachment." *Jacobs, supra*, 861 A.2d at 19. Some of the testimony concerned investigative procedures, and generally, "[e]vidence outlining the background of an investigation is admissible as non-hearsay," *Perritt v. United States*, 640 A.2d 702, 705 (D.C.1994) (citations omitted).

Even assuming, however, that in some instances the government was allowed to introduce prior consistent statements of witnesses (including statements made to the prosecutor during case preparation) that exceeded the proper limits of the cited hearsay exceptions, *see, e.g., Daye, supra*, 733 A.2d at 324–26, we are convinced that this error "[would] not have [had] a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Daye, supra*, 733 A.2d at 323 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). We said in *Porter, supra*, that "only in a case where the government's proof of guilt was marginal have we thought the prejudice from this impermissible bolstering enough to warrant reversal without more." *Id.* at 410 (quoting *Daye, supra*, 733 A.2d at 327)

(quotations and citation omitted). We are satisfied that the government's proof of guilt in this case was not "marginal." Indeed, we can "say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Daye, supra*, 733 A.2d at 328 (quoting *Kotteakos, supra*, 328 U.S. at 765, 66 S.Ct. 1239). The government presented eyewitness testimony from three persons, Felicia Johnson, Mr. Mason and Mr. Adolphus that Mr. Taylor was in the car from which bullets were fired at Mr. Richardson. Ms. Johnson believed that more than one gun was in use. Both Ms. Johnson and Mr. Mason identified the car as a red Ford Escort. The keys to a Ford Escort which belonged to Mr. Mason's mother were found in his apartment. In addition, Mia Lawrence saw Mr. Taylor with a revolver and an automatic weapon after he was pistol-whipped by Mr. Richardson and before the July 31, 1997 shooting. There was also less compelling but important ballistics evidence—cartridge casings from a .9mm automatic gun were found at the scene where Mr. Richardson was shot, and at least two bullets were extracted from Mr. Richardson's body which probably came from a revolver. Thus, although defense counsel's cross-examination elicited impeachment evidence, we are convinced that the government's evidence in the aggregate was strong enough to neutralize the prejudice from any arguable misuse by the prosecution of the right to introduce prior consistent statements.

### The Acquittal First and Reasonable Efforts Instructions

■ Mr. Taylor contends that "the trial court effectively stacked all chips against the defendant and in favor of the government, by depriving him of his right to elect one strategic course [here an acquittal first instruction] over another [a reasonable ef- forts instruction] while simultaneously subjecting him to re-prosecution at the government's behest." He maintains that "[t]he trial court's decision to instruct the jury over defense objection on 'reasonable efforts,' without safeguarding the Double Jeopardy rights of the defendant, prejudiced the defendant and therefore reversal is warranted." He claims that the jury's verdict was "coerced" when it allowed the jury to consider the lesser-included offense of second-degree murder without reaching a decision on the indicted charge of first-degree premeditated murder while armed.

Mr. Taylor selected an "acquittal first" instruction rather than a "reasonable efforts" instruction, in an attempt to avoid another trial on first-degree murder. Consequently, jurors were instructed that they must reach a verdict on the charge of first-degree premeditated murder while armed before considering the lesser-included offense of second-degree murder, if necessary. During deliberations, the jury sent three notes to the trial judge, all indicating an inability to reach a unanimous verdict on the first-degree murder charge. After the second note, defense counsel moved for a mistrial, or in the alternative, a version of the anti-deadlock instruction. The government opposed the anti-deadlock instruction and advocated a reasonable efforts instruction. The trial court gave a reasonable efforts instruction. After the third jury note, the defense moved for a mistrial, objected to a reasonable efforts instruction and the consideration of second-degree murder by the jury. The defense also expressed concern about a compromise verdict. The trial court again gave a reasonable efforts instruction, and then indicated that the jury could consider second-degree murder after making all reasonable efforts to reach a decision on the first-degree murder charge. During the discussion of the second jury

note, the government took the position that if Mr. Taylor were to be convicted of second-degree murder, without a resolution of the first-degree murder charge, and this court were to reverse that conviction, the government could retry him on the first-degree murder charge, but that if this court were to affirm a second-degree murder conviction, "the government would have, obviously, double jeopardy because it is the same set of facts." Hence, the prosecutor asserted, Mr. Taylor would not be retried on first-degree murder.

We agree with the government that Mr. Taylor's arguments are foreclosed by our decision in *Powell v. United States,* 684 A.2d 373 (D.C.1996). There, Mr. Powell was indicted for first-degree murder while armed, and convicted of the lesser-included offense of involuntary manslaughter while armed. During its deliberations, the jury sent two notes to the trial judge stating its inability to reach a unanimous verdict on the greater offense. The defendant moved for a mistrial after the second note was received. The judge denied the motion and gave the jury a reasonable efforts instruction, but directed the jury to proceed to the lesser-included offense if it still could not reach a unanimous verdict on second-degree murder. Similar to Mr. Taylor's argument here, Mr. Powell contended that the trial court erred in denying his motion for a mistrial and in giving a reasonable efforts instruction over his objection since "the decision on whether to provide the jury with an 'acquittal first' or a 'reasonable efforts' instruction rests solely with the defendant." *Id.* at 378. We recognized "that the trial court should use the form of the instruction selected timely by the defendant 'because the defendant's liberty is at stake,' " *id.* (citation omitted), but that "[w]hile 'a defendant is entitled to a jury in disagreement,' 'it is in the public interest . . . that a jury reach a verdict if it can reasonably do so,' " *id.* at 380 (citation

omitted). We also emphasized that "the 'acquittal first' approach, which the defendant may choose initially, bears within its own terms the possibility of a 'reasonable efforts' reinstruction in the event of deadlock." *Id.* at 381.

In Mr. Taylor's case, after three notes from the jury informing the court of its inability to reach a unanimous decision on first-degree murder, "the possibility of a 'reasonable efforts' reinstruction" became a reality in the public interest of reaching a verdict, if the jury could "reasonably do so." *Id.* at 381. On the facts of this case, and in light of our decision in *Powell,* we conclude that the trial court did not err in giving the reasonable efforts instruction, even though defense counsel raised a timely objection. Rather, the trial court "g[a]ve a temperate prod to a 'hung jury' so as to bring out a verdict." *Id.* at 380 (citing *Epperson v. United States,* 495 A.2d 1170, 1174 (D.C.1985) (quotations omitted)).

### The Death Penalty Instruction

■ Finally, Mr. Taylor complains that the trial court twice instructed the jury that the District does not have a death penalty. During final instructions, and over the objection of defense counsel, the trial court said:

> You are reminded that under the law of the District of Columbia, there is no death penalty. However, you are also instructed that in deciding guilt or innocence of the charges, you are not permitted to consider the matter of punishment. That is not an element of any of the offenses.

The trial court also informed the jury that "it is the responsibility of the court to impose an appropriate sentence, [and that] [a]s jurors, you are not allowed to consider what, if any, sentence might be imposed."

■ We recently considered a virtually identical contention leveled against an identical jury instruction by the same judge and concluded that there was no plain error. *Watkins v. United States,* 846 A.2d 293, 301 (D.C.2004). Since Mr. Taylor objected to the instruction, we review it for harmless error. *See Hunt v. United States,* 729 A.2d 322, 325 (D.C.1999). "In reviewing jury instructions, we must look at the instructions 'as a whole in assessing whether they constituted prejudicial error.'" *Id.* at 325 (quoting *Murchison v. United States,* 486 A.2d 77, 82 (D.C.1984)) (other citation omitted). Even assuming, without deciding, that the instruction regarding the death penalty constituted error, it was harmless. As we reiterated in *Watkins, supra,* "[t]he jury is presumed to follow the instructions of the court." *Id.* at 301 (citation omitted). That presumption and the court's admonition that jurors "are not allowed to consider what, if any, sentence might be imposed," rendered the instruction harmless.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*